In The

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

NO. 09-21-00178-CV

_____

**L&S PRO-LINE, LLC AND LEE BURKETT, Appellants**

**V.**

**GARRETT GAGLIANO, SNOOK HOLDINGS, LLC, AND TACTICAL
AUTOMATION, INC., Appellees**

**On Appeal from the 457th District Court
Montgomery County, Texas
Trial Cause No. 18-06-07704-CV**

**MEMORANDUM OPINION**

This case involves a business dispute of a two-member Texas limited liability

company, L&S Pro-Line ("L&S"). Appellants, L&S and Lee Burkett, appeal the trial

court's judgments for Appellees Garrett Gagliano, Snook Holdings, LLC ("Snook"),

and Tactical Automation, Inc. ("Tactical").[1] On appeal, Appellants complain that

---

[1]Lee Burkett also filed two petitions for writ of mandamus, which this court
denied. *See In re L&S Pro-Line, LLC & Lee Burkett*, No. 09-21-00174-CV, 2021
WL 4312981, at *1, 4 (Tex. App.—Beaumont Sept. 23, 2021, orig. proceeding

1

the trial court erred by: (1) holding Burkett did not successfully purchase Gagliano's membership interest under the L&S Amended and Restated Company Agreement ("Company Agreement"); (2) holding that Tactical was a third-party beneficiary of the Company Agreement with standing to sue; (3) striking Burkett's expert; (4) allowing Gagliano to testify as an expert on lost profits and allowing testimony of lost revenue rather than lost profits; and (5) denying Appellants' Motion for Mistrial. Appellants also complain that there is insufficient evidence to support the jury's conclusion that Appellants breached the Company Agreement and the jury's award of actual damages, punitive damages, and attorney's fees in favor of Appellees.

We conclude the trial court erred in granting partial summary judgment for Gagliano. For the reasons set forth below, we affirm the trial court's judgment in part, we reverse and render the trial court's judgment in part, and we reverse and remand the matter to the trial court for further proceedings consistent with this opinion.

---

[mand. denied]) (mem. op.); *In re L&S Pro-Line, LLC & Lee Burkett*, No. 09-20-00261-CV, 2020 WL 7756153, at *1 (Tex. App.—Beaumont Dec. 30, 2020, orig. proceeding [mand. denied]) (mem. op.).

2

## BACKGROUND

In 2015, Burkett bought a 75% interest in L&S, which manufactures skid equipment, metering equipment, control equipment and supplies parts to support the equipment it manufactures. In 2016, Gagliano bought the other 25% interest of L&S, and Burkett and Gagliano entered into the Company Agreement and agreed to share responsibilities at L&S. Burkett was a member and the Executive Manager in charge of sales, marketing, design and engineering, and Gagliano was a member and the Chief Financial Officer ("CFO") in charge of managing L&S's books and records. Gagliano also owned Snook, L&S's landlord for a period, and Tactical, which manufactured control system panels, and the Company Agreement gave Tactical the right to bid on control panels sourced by L&S to third parties.

In 2018, Burkett's and Gagliano's relationship deteriorated, Snook evicted L&S, and Gagliano allegedly refused to perform his duties as CFO, forcing L&S to contract with a third-party to recreate L&S's books. Burkett and Gagliano unsuccessfully mediated their business disputes, and in 2019, Burkett sent Gagliano a notice offering to purchase his 25% interest for $1.3 million as provided by the Company Agreement. After Gagliano failed to respond, Burkett sent Gagliano a cashier's check for $1.3 million, and Gagliano never returned the check. Subsequently, L&S sent Gagliano distributions totaling $1,347,376.28 for his 25% interest in L&S's profits for 2018 and 2019. From May 2019, Burkett operated L&S

3

independently without Gagliano's assistance, and after Burkett took over the operations of L&S, he amended L&S's Company Agreement and continued to use L&S funds to entertain company clients, and to pay for travel, legal fees, and other expenses that were tied to the operations of L&S. Before May 2019, Burkett and Gagliano had both used L&S funds to take L&S clients and vendors hunting, fishing and to sporting events, and they both had also used L&S's funds for personal expenses, offsetting those expenses against future distributions. Gagliano had not complained about L&S using funds to entertain clients before L&S sued.

In June 2018, L&S filed Plaintiff's Original Petition, Request for Declaratory Relief, and Request for Injunctive Relief/Temporary Restraining Order against Gagliano, alleging causes of action for breach of contract, misappropriation of trade secrets, breach of fiduciary duty, and declaratory judgment. Gagliano filed an Original Answer and Verified Denial, and in his First Amended Original Answer he asserted additional and affirmative defenses.

In October 2018, L&S filed Plaintiff's First Amended Petition, Request for Declaratory Relief, and Request for Disclosure and added, among others, Snook and Tactical as defendants. L&S alleged that Gagliano had made unauthorized payments from L&S to Snook and Tactical for his personal benefit. L&S alleged that after Burkett refused Gagliano's offer to buy his interest in L&S for $5 million, Gagliano embarked on a campaign to disrupt and harm L&S, including demanding that L&S

4

vacate its premises located on Snook's property. L&S alleged that Gagliano quit performing his duties as CFO and engaged in conduct that damaged L&S and subjected L&S to potential liability. L&S also alleged that Gagliano violated the Company Agreement by competing with L&S and using L&S's trade secrets.

In its breach of contract claim against Gagliano, L&S claimed that Gagliano breached the Company Agreement by competing with L&S, disclosing its confidential trade secrets, and charging and making unauthorized payments to himself and his related entities. L&S alleged Gagliano, as a manager, member, and CFO, owed fiduciary duties to L&S, and Gagliano breached those duties. L&S sought a declaratory judgment holding that the non-competition and non-disclosure provisions in the Company Agreement were enforceable and that Gagliano breached those provisions.

Appellees filed a Second Amended Original Counterclaim, Third-Party Petition, and Application for Temporary Restraining Order, Temporary Injunction and Permanent injunction and Request for Permanent Relief. In the Second Amended Original Counterclaim, Appellees alleged that the Company Agreement included a provision that restricted the members (except for Gagliano while "during the term of ownership of any Interests or while acting as a Manager") from engaging in the business of building, assembling, or selling control systems or panels. Appellees also claimed that the Company Agreement included a provision

5

that we will refer to in the opinion as a right of first refusal that L&S and Burkett also breached. Under the right of first refusal, if any product line that L&S sold included a control system panel, Tactical Automation LLC would be given the right to provide the panel to L&S for the product that was to be sold to a third party by L&S unless several conditions, which are discussed later, applied. The Company Agreement also required Burkett to obtain Gagliano's consent before engaging in any transaction that involved more than $5,000.

Appellees alleged that in early 2018, Burkett began violating the Company Agreement by placing orders exceeding $5,000 and building and assembling his own control panels and systems to undermine Gagliano and the Company Agreement as it relates to Tactical's right of first refusal. Appellees also alleged that as an intended third-party beneficiary under the Company Agreement, Tactical had the right to enforce the provisions in the Company Agreement, including those related to the right of first refusal, and to seek damages that resulted from the Appellants' failure to comply with the Company Agreement. Appellees alleged that Burkett violated the Company Agreement and breached his fiduciary duties to L&S by acts that included engaging in bribes, taking over the management of financial affairs without Gagliano's consent, obstructing Gagliano from performing his CFO functions, and refusing to pay Gagliano the proper amount he was owed for his share of the distributions, alleging his damages for the distributions he did not receive exceeded

6

$2.23 million. According to Appellees, Burkett's material breach of the Company Agreement constituted a Terminating Event, which prevented Burkett from effectively exercising the Company Agreement's Push Pull provision and purchasing Gagliano's interest in L&S. Relying on the claim, the Appellees argued that because Burkett's exercise of the Push Pull was ineffective, Gagliano was not required to respond.[2]

Burkett filed his Original Answer, Verified Denial, and Counterclaim, requesting that Appellees take nothing through the suit and award him court costs, attorney's fees, and any other relief to which he was entitled. In Appellants' First Amended Original Answer, Appellants argued that Appellees' claims were barred by, among others, the doctrines of prior material breach, waiver, and payment.

Appellees filed Defendants' No-Evidence Motion for Partial Summary Judgment, arguing, among other things, that there was no evidence of (1) L&S's full performance under the Company Agreement through its Executive Manager Burkett, (2) an alleged breach of the Company Agreement by Gagliano, (3) damages caused

---

[2]Section 12.7 of the Company Agreement contains a "Push Pull" provision, which members of L&S could invoke upon having an "Unresolved Dispute." Under the Push Pull, the Member exercising the Push Pull option was required to send the other members of L&S an offer to purchase that member's shares for a specific price. The member who was given the offer was required within 30 days to either elect to sell his interest in the LLC at the stated price or to buy out the member who had exercised the Push Pull option interest in the LLC at the same proportionate price.

by Gagliano's alleged breach, or (4) reasonable and necessary attorney's fees attributable to the alleged breach. Appellees also argued that L&S's claims for misappropriation of trade secrets, breach of fiduciary duty, officer removal under the Texas Declaratory Judgment Act, fraudulent misrepresentation, fraudulent transfer under the Texas Uniform Fraudulent Transfer Act, conversion, and civil theft must be dismissed because Appellants failed to produce evidence of the required elements of those claims.

Appellants filed a Response to Defendants' and Counter-Plaintiff's No-Evidence Motion for Summary Judgment and attached the following summary judgment evidence: the Company Agreement; Deposition of Gagliano; Deposition of Chelsea Lindsay; Affidavit of Burkett; Affidavit of Jason Casell; Affidavit of Jeff Compton; Verification of Casell; Chase Bank Records; L&S's Engagement Letter with Baker Tilly Virchow Krause, LLP ("Baker Tilly"); L&S's Chase Bank Statements; L&S's Attorneys' Fee Invoices; and Affidavit of Jay Tompkins.

As to the breach of contract claim, Appellants argued that whether they had fully performed under the Company Agreement was not an element to recover under breach of contract. Appellants also maintained the summary judgment evidence supported the claim that Gagliano breached his contractual obligation to accurately maintain L&S's books and records. Appellants argued that under the Company Agreement, Gagliano had an affirmative obligation to act as L&S's Treasurer and

8

CFO and maintain current and accurate books and records, and in his deposition, Gagliano acknowledged that he failed to do so at all times. Appellants also argued that Jeff Compton, the Certified Public Accountant ("CPA") and forensic accountant who reviewed L&S's books and records under Gagliano's tenure as CFO, determined that L&S's books and records were incomplete, contained fundamental accounting errors, and showed that Gagliano failed to perform his duties under the Company Agreement. Appellants also argued that Gagliano's breach caused damages to L&S, forcing L&S to hire a temporary bookkeeper to perform Gagliano's duties, to pay Baker Tilly $10,452 to reconcile L&S's books and records, and to pay taxes.

In his deposition, Gagliano testified that he and Burkett agreed that he would serve as L&S's CFO and Treasurer. Gagliano testified that he understood his responsibilities included managing and maintaining current and accurate financial books and records. Gagliano testified that after taking on those responsibilities, he did not always perform them. Gagliano explained that he and Burkett agreed to hire David Zareie, a CPA. Gagliano also explained that he was responsible for paying L&S's taxes. Gagliano testified that he had not performed any CFO work or communicated with Burkett since Burkett asked him to leave the L&S premises. Gagliano added that a Tactical purchase order shows that while he acted on

Tactical's behalf, he sent L&S's box design drawings to D&R Specialties for purchase.

In his affidavit, Burkett stated that as L&S's Executive Manager his job was to procure "raw material including but not limited to unfinished enclosures for L&S Pro-Line equipment." Burkett claimed that D&R used L&S's drawings to fabricate and sell enclosures to Tactical, which Tactical sold without L&S's approval. Burkett explained that L&S did not make any profits on D&R's unauthorized sales to Tactical. Burkett also stated that in July 2018, Gagliano said that he had abandoned his job duties as L&S's CFO and Treasurer. Burkett claimed this forced L&S to incur extra expenses by hiring a bookkeeper and by hiring Baker Tilly to audit L&S's books and records and to address a tax issue. Burkett also explained that after Gagliano and Tactical quoted L&S a price for control panels, Tactical charged a higher price without approval. Burkett stated that he found twelve check payments from L&S to Snook that did not have any invoices and that transfers were made from L&S's Chase checking account to Gagliano's personal checking account without Burkett's knowledge or consent.

In his Affidavit, Compton, a CPA, stated that he had reviewed twelve check payment transactions from L&S to Snook and five electronic transfers, which occurred in June and July 2018 and involved money going from L&S's Chase Bank Account to Gagliano's account without underlying support to show that these

10

transfers involved L&S's business expenses. Jason Casell, L&S's and Burkett's attorney, stated in his Affidavit that despite all efforts, he could not secure an Affidavit from Chase Bank and the owner of D&R to include in the summary judgment response. L&S's February 2019 Engagement Letter with Baker Tilly shows that L&S hired Baker Tilly to perform Tax Compliance Services for the 2018 tax year. Jay Tompkins, a tax partner with Baker Tilly, swore in his Affidavit that, after reviewing L&S's books and records under Gagliano's tenure as CFO, that the books and records of L&S contain fundamental errors, are incomplete, and that the errors required extensive work to correct.

Appellants filed Pleas to the Jurisdiction arguing that the trial court should dismiss Gagliano's breach of fiduciary duty claim against Burkett for Burkett's purported breach against L&S because Gagliano lacked standing to assert a breach of fiduciary duty claim since Burkett acquired Gagliano's interest in L&S when he exercised his option to buy Burkett's shares in June 2019. Consequently, since the fiduciary duty theory was based on a direct or derivative action that belonged to L&S, a company in which Gagliano was not a member when he filed suit, Appellants claimed that Gagliano lacked standing to file a claim based on a theory involving a derivative claim. Appellants also argued that in 2018, Gagliano began disrupting L&S's business, including demanding that L&S vacate the property that Snook owned when Gagliano began stating that he would no longer perform his duties as

11

L&S's CFO or conduct business on behalf of L&S. Appellants alleged that on May 14, 2019, Burkett exercised his option under section 12.7(b) of the Company Agreement to purchase Gagliano's entire partnership interest in L&S, and that by June 11, 2019, under the terms of the buy-out option in the Company Agreement, Gagliano was no longer a member of L&S after Burkett exercised his option to buy out Gagliano and paid him $1.3 million dollars. Appellants also argued that even if the trial court were to find that Gagliano remained a member of L&S, Gagliano lacked standing under the shareholder-standing rule because the purported harm was to L&S and if Gagliano did continue to retain his ownership interest in L&S, his membership interest in the company was only indirectly harmed.

Appellants also filed a Plea to the Jurisdiction on Tactical's Breach of Contract Claim, arguing that Tactical is not a third-party beneficiary and lacked standing to assert a claim against Appellants. Appellants argued that Tactical was neither a donee beneficiary, which requires the performance promised to be a pure donation, nor creditor beneficiary, which requires that the maker of the contract intend to confer a benefit upon the third party and to have the right to enforce the contract. Appellants argued that based on the Company Agreement's plain language, nothing suggests that Burkett or Gagliano intended for Tactical to enforce a breach of the Company Agreement, which includes a provision that, subject to exceptions discussed below, gave Tactical a right of first refusal in supplying L&S with the

control panels that were incorporated into its products that were sold by L&S to third parties. Appellants also argued that Tactical did not have standing to sue Burkett because L&S is the party that committed the alleged wrongful acts.

Appellees filed Objections to the Deficient Evidence Offered by L&S in Support of its Response to All Defendant's No-Evidence Motion for Partial Summary Judgment and asked that all the offending evidence be struck, including the Affidavits of Burkett, Cassell, Compton, and Tompkins. Appellees also filed a Reply in Support of their No-Evidence Motion for Partial Summary Judgment. Appellees argued, among other things, that L&S failed to adduce evidence to support its affirmative claims of fraudulent transfer and officer removal/declaratory judgment and adduced no evidence to support the challenged elements on its breach of contract claim against Gagliano. Appellees argued that L&S failed to produce evidence that it complied with the Company Agreement and that Burkett's affidavit, which alleged that he and L&S performed under the terms of the Company Agreement, and that the affidavit was conclusory and unsupported by competent evidence. Appellees also argued that neither Gagliano's deposition transcript nor Compton's affidavit show that Gagliano breached the Company Agreement because Gagliano testified that the Company Agreement allowed him to hire a CPA firm. In their reply, the Appellees also argued that Tompkins's affidavit was conclusory, and that it was unclear who was testifying in the affidavit. Based on Appellees'

13

objections to the summary judgment evidence, L&S filed a Motion for Leave to Amend its Summary Judgment Evidence to cure the complaints Gagliano, Snook, and Tactical had raised with its summary-judgment evidence. In their Motion for Leave, they argued the trial court should overrule Appellees' objections because the affidavits were not based on hearsay and supported by documents that were properly authenticated.

Tactical filed a Response to Appellants' Plea to the Jurisdiction on its Breach of Contract Claim, arguing the Company Agreement explicitly confers contractual benefits on Tactical, making it a third-party beneficiary with standing to sue Appellants. Tactical argued that it was a donee beneficiary because the Company Agreement provided it would receive the pure benefit of control systems sales outright without having to satisfy, offset, or eliminate some other underlying legal obligation that Appellants owed Tactical or Gagliano. Tactical further argued that the control panel/systems provisions were included to benefit Tactical and Gagliano as part of the arrangement for Gagliano to invest in L&S. Additionally, the Company Agreement contemplates Tactical's involvement and enforcement of the Company Agreement by giving Tactical the right to withhold consent to a customer's request for third parties to perform the control panel/system work. Tactical maintained that Gagliano's right to enforce the Company Agreement as a member of L&S extended to his right as an affiliate of Tactical.

14

Gagliano filed a Response to Third-Party Defendant Lee Burkett's Plea to the Jurisdiction, arguing that Burkett's attempted buyout did not strip him of standing to sue on L&S's behalf. Gagliano argued that Burkett failed to submit evidence of a buyout, except for what Gagliano described as Burkett's "summary recitation" of having exercised the Push Pull purchase option. And absent evidence of an effective buyout, according to Gagliano, Burkett's standing argument fails. Gagliano also argued that Burkett did not move for summary judgment to seek a ruling on the alleged buyout, and the deadline to do so had passed. Gagliano maintained that Burkett's attempt to exercise the buyout was void and ineffective based on Burkett's prior material breaches of the Company Agreement, failure to address the unpaid distributions, commission of illegal actions that constituted "Terminating Events" under the Company Agreement, and failure to follow the Company Agreement's procedures.

Gagliano also argued that Burkett's attempted exercise of the Push Pull provision was an involuntary destruction of Gagliano's interest to protect Burkett's illegal and dishonest conduct, and a fact issue on the purpose of Burkett's actions exists precluding his Plea to the Jurisdiction. Gagliano contended that the shareholder standing rule did not prevent minority owners from suing officers or a controlling owner who had injured a jointly owned company. He also argued Texas Business Organizations Code Chapter 101 allows members of a limited liability

15

company to pursue derivative actions, and the business judgment rule does not undercut a member's standing or bar derivative suits in cases involving closely held limited liability companies.

Gagliano asked the trial court to deny Burkett's Plea to the Jurisdiction because he had standing to sue for breach of fiduciary duty against Burkett as a faithless officer and manager who harmed L&S. Gagliano included with his Response an email from Zareie, L&S's CPA, informing Gagliano that during the last few months and since Gagliano had been instructed to stay away from the company, Zareie had witnessed suspicious activities, including the possible hiding of revenues, underpayment of tax liabilities, and disbursements from unknown bank accounts. Zareie stated that he notified the company representative of the activities and would be withdrawing as L&S's accountant.

In March 2020, L&S filed its Fifth Amended Petition against Appellees, arguing that a dispute existed concerning whether Burkett's purchase effected a complete sale of Gagliano's ownership interest and whether L&S had fully compensated Gagliano under the Company Agreement's terms. L&S alleged that, among other actions, Gagliano breached the Company Agreement by failing to perform his duties, misappropriating trade secrets by using L&S's drawings for Tactical's behalf, and by breaching his fiduciary duties. L&S requested a declaratory judgment that Burkett purchased Gagliano's entire interest in L&S on May 14, 2019,

16

under Section 12.7(b) of the Company Agreement and that on July 12, 2019, the Company paid Gagliano all distributions owed for 2018 and 2019, consistent with Section 6.3 of the Company Agreement. L&S also requested that the trial court order Gagliano removed as L&S's manager, officer, CFO, and Treasurer based on his actions, and asked the trial court to prevent Gagliano from participating in any vote authorized by the Company Agreement, alleging that he "has an irreconcilable conflict of interest on such issues."

In March 2020, Appellants filed a First Amended Original Answer, alleging that the business judgment rule, express and/or implied consent, and the doctrines of prior material breach, ratification, estoppel, lack of standing, repudiation, payment, and waiver barred Appellees' claims. Appellants also alleged that Appellees' claims were barred because Burkett's conduct was justified and excused by Appellees' unclean hands. Appellants also claimed that because Gagliano lacked standing under the shareholder standing rule, he was not entitled to assert a derivative action on L&S's behalf. On May 8, 2019, Gagliano filed a First Amended Original Answer to L&S's Fourth Amended Petition, asserting, among others, the additional and affirmative defenses of fault, consent, lack of proper presentment, the business judgment rule, truth, lack of reliance, privilege, justified conduct, excuse, and the doctrines of estoppel, prior material breach, ratification, waiver, offset, and setoff.

In May 2020, Appellants filed a Verified Motion for Continuance and, in the alternative, Response to Defendants' No-Evidence Motion for Summary Judgment, requesting that the submission of the No-Evidence Motion for Partial Summary Judgment be moved to a later date so the parties could complete discovery. Appellants also argued that the trial court should deny the motion on L&S's breach of contract, breach of fiduciary duty, fraudulent misrepresentation, and officer removal claims based on the law and evidence submitted. Appellants maintained that the trial court had granted its previous Motion to Continue to conduct discovery, but another continuance was needed because the COVID-19 pandemic had prevented the parties from completing discovery.

The record shows that Appellants filed a Traditional and No-Evidence Motion for Partial Summary Judgment, and Burkett moved for summary judgment on his declaratory judgment action seeking the determination of whether he complied with the Push Pull provision in the Company Agreement and purchased Gagliano's membership interest on June 11, 2019. Appellants also moved for summary judgment on Appellees' causes of action for breach of contract, breach of fiduciary duty, equitable accounting, indemnification, and abuse of process.

Appellees filed a Response to Appellants' Traditional and No-Evidence Motion for Partial Summary Judgment, arguing that the motion included many allegations unsupported by any evidence, and that material fact issues made

summary judgment improper. Appellees argued that Burkett was in prior material breach of the Company Agreement when he tried to exercise the Push Pull provision and conclusively failed to comply with the Company Agreement. Appellees also argued that Burkett breached his fiduciary duty to L&S and Gagliano, who had standing to bring a direct or derivative suit against Burkett for both his and L&S's benefit. Appellees argued that despite Burkett claiming he fully complied with the Company Agreement when he exercised the Push Pull on April 12, 2019, and bought Gagliano out of L&S on June 11, 2019, Burkett's own evidence shows that he failed to pay Gagliano's 2018 and 2019 distributions until July 15, 2019. Gagliano also disputed the amounts of those distributions. Appellees maintained that before Burkett could exercise the Push Pull, the parties were required to mediate the dispute and continue to mediate until the controversy was resolved or the mediator made a good faith finding that no possibility existed that the case could be settled through mediation, neither of which conditions had occurred. Appellees also argued that Burkett failed to make the payment in cash as required by the Company Agreement at closing, and at the very least, they claimed that genuine issues of material fact existed as to whether Burkett effectively exercised the buy-out option in the Company Agreement, which the Company Agreement and the parties refer to as the Push Pull. Appellees maintained that Appellants wrongfully obtained and used a

19

Temporary Restraining Order to prevent Gagliano from enforcing his rights under the Company Agreement and performing his dues as L&S's CFO.

Appellees also argued that a shareholder derivative action allows Gagliano to sue on L&S's behalf for the wrongs Burkett committed against the company, and the Business Judgment Rule did not shield Burkett from Gagliano's claims because Burkett's conduct was not unsound business judgment or negligent but instead was intentional and unlawful with the object of self-dealing. As to Tactical, Appellees maintained that Tactical was a third-party beneficiary and that its standing to sue is based on the Company Agreement as a donee beneficiary. Under the Company Agreement, Appellees argued, Tactical was entitled to receive the pure benefit of any control system panels that were not manufactured by Tactical but that had been incorporated into the product lines and then sold by L&S.

Appellants filed a Reply to Appellees' Response to Traditional and No-Evidence Motion for Partial Summary Judgment, again arguing that Gagliano lacked standing to bring a derivative action because he did not possess a present ownership interest, Tactical lacked standing because it was not a third-party beneficiary, and Gagliano failed to establish a prima facie case for abuse of process. Burkett filed a Reply in support of his Motion for Partial Summary Judgment as to his request for declaratory relief and a finding that, as of June 11, 2019, Burkett had purchased Gagliano's entire interest in L&S. Burkett argued that Gagliano's affirmative

defense of prior material breach was not timely asserted and irrelevant because Gagliano continued to accept the benefits under the Company Agreement by accepting distributions. Burkett argued that Gagliano's Response militates against finding a failure of a condition precedent because Gagliano admitted the parties tried to resolve their dispute in mediation. Burkett maintained that the trial court should grant summary judgment and find that he purchased Gagliano's membership interest as of June 11, 2019, because Burkett had complied with the material terms of the buy-out provision in the Company Agreement that governed the rights of Gagliano's and Burkett's ownership of L&S.

Burkett also filed Objections to Evidence Gagliano attached to his Response to Burkett's Motion for Partial Summary Judgment. Burkett objected to Gagliano's First Declaration, claiming the statements in it were conclusory, and contained hearsay, impermissible opinions, and legal conclusions. Burkett also objected to Gagliano's Second Declaration and John Ellis's Declaration, arguing they were both not credible and fatally defective. Appellants filed Objections to Evidence Appellees offered in Response to Appellants' Traditional and No-Evidence Motion for Partial Summary Judgment on Appellees' claims for breach of contract, breach of fiduciary duty equitable accounting, indemnification, and abuse of process.

On May 8, 2020, Gagliano also filed a Sur-Reply in Support of his Response to Burkett's Motion for Partial Summary Judgment and Motion for Leave to File

Trial Amendment, Gagliano argued that Burkett had waived his election of remedies claim as an affirmative defense, and Gagliano also argued that Burkett had not shown that why Gagliano's defense that Burkett had committed a prior material breach did not relieve him from performing under the Company Agreement after that breach occurred. Gagliano also objected to trying the election of remedies issues by consent, and he argued that the issue would be relevant only after the verdict and that an election of remedies defense did not bar the trial court from granting summary judgment. According to Gagliano, Burkett bore the burden to prove that he had complied with the Company Agreement, and as the non-movant it was not Gagliano's burden to plead and prove that Burkett had complied with all conditions precedent to enforcing his rights under the party's agreement. Gagliano explained that L&S filed its Fifth Amended Petition on March 9, 2020, which was both after the pleadings deadline and without leave of court. In the Fifth Amended Petition, Burkett had asked for a declaratory judgment that he had purchased his interest on May 14, 2019. Gagliano noted that he had objected to the late filed pleading and because the deadline to amend pleadings under the trial court's docket control order had closed, he had not amended his pleadings to add affirmative defenses, including claims for failure of conditions precedent. Gagliano explained that he also objected and moved to strike Burkett's late-filed Motion for Partial Summary Judgment, but the trial court reopened pleadings on May 4, 2020, and he did not have an

opportunity to plead the affirmative defense of failure of conditions precedent. Gagliano requested leave to file his Verified Second Amended Original Answer, which includes a failure of conditions precedent defense that argues Burkett failed to satisfy the conditions to close the buy-out option by tendering the required payment at closing in cash.

On May 26, 2020, Appellants filed an Amended Plea to the Jurisdiction on Tactical's Breach of Contract Claim, arguing that Tactical is not a third-party beneficiary and lacks standing to assert a breach of contract claim. Appellants stated that their Motion for Partial Summary Judgment was based on many of the same issues raised in the Plea. Appellants argued that since the Company Agreement provided that Tactical would benefit so long as Gagliano owned or controlled Tactical, it only intended for Gagliano to financially benefit from Tactical's opportunity to perform work. Appellants maintained that Tactical was an incidental beneficiary with no enforceable contractual rights because its benefit immediately terminated if Gagliano was no longer affiliated, and the provision was solely for Gagliano's benefit.

Burkett also filed an Amended Plea to the Jurisdiction, moving to dismiss Gagliano's breach of fiduciary duty claim against Burkett contending Gagliano lacks standing to assert such a claim as a direct or derivative action on L&S's behalf. Burkett claimed that Gagliano refused to renew L&S's lease with Snook and evicted

23

L&S because a customer refused to use Tactical. Burkett claimed that mediation with Alan Levin on July 17, 2018, "resulted in an impasse and Burkett and Gagliano did not resolve any of their, by then, many disputes." Burkett explained that although he was prepared to buy-out Gagliano, he agreed to a second mediation with Honorable Sylvia Matthews on April 9, 2019, and "[a]gain, the parties did not resolve any of their several disputes at the conclusion" of the mediation, and after the parties left, "Judge Matthews made an additional, final attempt to settle by sending a mediator's proposal[] to both parties which was not mutually accepted, resulting in an impasse." Burkett explained that a mediator's proposal is "'**typically used as a measure of last resort . . . after all other options for compromise have been exhausted**[.]'" Burkett asserted he then notified Gagliano's attorney of his intent to purchase Gagliano's membership interest, after which he exercised his option under the Company Agreement to buy Gagliano out for $1.3 million. L&S made and recorded the closing effective as of June 11, 2019, at which time Gagliano no longer had standing to pursue his claims.

Gagliano filed a Response to Burkett's First Amended Plea to the Jurisdiction, complaining that Burkett's Amended Plea was his attempt to disguise another motion for summary judgment as a plea to the jurisdiction. In support of this, Gagliano asserted the buy-out issue was not jurisdictional, rather it concerned factual

matters and a determination of substantive law given Burkett's material breaches and failure to follow the buy-out procedure.

In August 2020, Gagliano filed a Traditional Motion for Partial Summary Judgment on his request for declaratory judgment and his affirmative defenses of prior material breach and failure of conditions precedent, arguing that Burkett did not buy him out of L&S because he failed to follow the Push Pull provision's precise procedure for completing a forced buyout under the Company Agreement and was in prior material breach of the Company Agreement. Gagliano argued that Burkett breached the Company Agreement's provisions: (1) limiting the type of business Burkett and L&S could conduct; (2) requiring work to first be offered to Tactical; (3) requiring Gagliano's consent for transactions exceeding $5,000; and (4) payment of quarterly distributions of net cash from operations to members. Gagliano maintained that he was entitled to summary judgment and declaratory judgment that Burkett's attempt to exercise the Push Pull provision was ineffective for his prior material breaches and failure to follow the buyout procedures requiring a good faith finding of no possibility of settlement by the mediator, closing on the sixtieth day after delivery of the Purchase Notice, and payment in cash. Gagliano argued that Burkett materially breached the Company Agreement by using L&S's funds to pay for prostitution and other bribes to L&S's customers, driving drunk with an L&S customer, knowingly employing an undocumented immigrant and registered sex

25

offender, physically excluding Gagliano from L&S's premises, refusing to source control panels from Tactical, engaging in unauthorized competition that caused Tactical to suffer $1,701,074 in actual damages, engaging in transactions exceeding $5,000, and failing to authorize quarterly distributions to Gagliano.

Gagliano maintained that Burkett was in material breach of the Company Agreement on April 12, 2019, when he tried to exercise the Push Pull and remained in material breach on June 11, 2019, the date he claims he bought out Gagliano. Gagliano further argued that Burkett's attempt to pay him distributions for 2018 and 2019 after the date Burkett claimed the buyout occurred showed that Burkett was in material breach of the Company Agreement when he sought to exercise the Push Pull. Gagliano asserted he never deposited the distribution checks, which were made out to Wahoo Lending, LLC, and fell short of the undistributed profit amounts that Gagliano's expert, Steven Fowler, testified he was owed for 2017, 2018, and 2019. Gagliano further argued that Burkett made additional unauthorized expenditures of L&S's funds for his sole benefit of at least $686,670 through January 2020, and Gagliano claimed he was entitled to his proportionate share of that amount, which is $228,890.

Gagliano maintained that Burkett failed to properly exercise the Push Pull absent a mediator's good faith finding that there is no possibility of settlement. He also argued that a closing must be held sixty days after the purchase offer, which

26

Burkett ignored. He also asserted that Burkett sent a cashier's check from an unrelated company called HAL Solutions thirty-two days after the initial notice on April 12, 2019, declared Gagliano was bought out as of May 13, 2019, and failed to pay cash at closing. Gagliano explained that despite Burkett being in breach of the Company Agreement, on June 11, 2019, sixty days after the purchase notice, he traveled to Houston to settle the buyout issue and assign his membership interest upon Burkett paying the purchase price in cash at closing and properly paying the distributions owed to Gagliano. Gagliano stated that since Burkett failed to appear at the closing and pay in cash, Burkett did not follow the Push Pull procedure and satisfy the Company Agreement's conditions precedent to a buyout. Thus, Burkett's buyout attempt was unsuccessful.

Appellants filed a Response to Gagliano's Motion for Partial Summary Judgment, arguing that the trial court should deny Gagliano's Motion regarding the sole issue of whether Burkett's exercise of the Push Pull provision purchased Gagliano's entire interest in L&S effective June 11, 2019. Appellants argued that Gagliano could not both claim benefits under the Company Agreement and argue the Push Pull provision could not be enforced because the Company Agreement was invalid during the notice period. Appellants asserted that Gagliano neither responded to Burkett's notice, nor complained that the Company Agreement was no longer in force. Appellants argued that Gagliano failed to meet his burden of conclusively

establishing the affirmative defense of Burkett's material breaches of the Company Agreement or that the Company Agreement prevented Burkett's alleged conduct, and the jury should decide whether Burkett's alleged conduct violated the Company Agreement. Appellants maintained that the law does not support Gagliano's argument that a material breach precludes the enforcement of a contract's terms, and Gagliano continued to accept quarterly distributions and never elected to cease performance and terminate the Company Agreement. Appellants claimed that Gagliano's continued performance under the Company Agreement renders Burkett's alleged breaches immaterial to the trial court's determination of whether Burkett complied with the Push Pull provision. Additionally, they claimed that even if the defense of prior material breach applied, Gagliano failed to identify the provision of the Company Agreement claimed to have been breached and failed to present any evidence to support each of the elements required to support a claim on a theory of prior material breach as a matter of law. Appellants also argued that a nonmaterial breach does not excuse future performance and instead only gives rise to a claim for damages. Appellants also maintained that the business judgment rule precluded Gagliano from maintaining a claim based on a theory of material breach because the evidence shows that Burkett always acted for L&S's sole benefit and exercised sound and reasonable judgment. They also asserted the expenses Burkett incurred as an L&S executive are common in the oil and gas services.

For their part, Appellants asserted that Burkett had fully complied with the Push Pull provision when, on May 14, 2019, he paid Gagliano $1.3 million via a cashier's check, which they argued under the law is treated as the functional equivalent of cash. Appellants also maintained that Gagliano received all ownership benefits in L&S through the date of the sale of Gagliano's interest in L&S closed, which Appellant claim occurred on June 11, 2019. Appellants argued that under the Company Agreement, performance before the due date is equivalent to performance on the due date because the $1.3 million payment by cashier's check remained in the hands of Gagliano's attorney. Appellants also argued that Burkett fulfilled all conditions precedent required under the Company Agreement's option to buy-out another member, and that in his May 4, 2020 Response, Gagliano admitted that the parties unsuccessfully attempted to resolve their dispute with mediators twice.

Gagliano filed Objections to Evidence Offered by Appellants in Support of their Response to Gagliano's Motion for Partial Summary Judgment. Gagliano also filed a Reply in Support of his Motion for Partial Summary Judgment against Appellants on his request for declaratory judgment and his affirmative defenses of prior material breach and failure of conditions precedent, arguing that there were no fact issues and that he was entitled to summary judgment. In his Reply, Gagliano argued that Appellants adduced no evidence that Burkett complied with the Push Pull buyout procedure. Gagliano argued that Burkett failed to satisfy the conditions

precedent to a buyout by: (1) showing that a mediator made a good faith finding there is no possibility of settlement; (2) sending a Purchase Notice to Gagliano; (3) participating in a closing sixty days after the attempted buyout; and (4) paying cash at closing. Gagliano further argued that the evidence establishes Burkett materially breached the Company Agreement including failing to pay him correct distributions. Gagliano explained that he sued Burkett individually, and he argued that the business judgment rule did not apply to protect corporate officers from liability to individual members from a claim by another member who claims he has been personally harmed.

In March 2021, Appellants filed a Motion Under Rule 166(g) to Determine Tactical Is Not a Third-Party Beneficiary, arguing that Tactical cannot overcome the presumptions against conferring third-party status. Appellants maintained that Tactical is not a creditor beneficiary because the Company Agreement does not provide Tactical with the right to enforce the agreement, and it is not a donee beneficiary but an incidental beneficiary because Gagliano, on behalf of Tactical, agreed to an exchange–Tactical would perform the control panel work under certain conditions. Appellants argued that the parties intended for Gagliano to financially benefit from the control panel work sent to Tactical.

Appellants also filed a Motion Under Rule 166(g) to Determine, as a Matter of Law, that Burkett purchased Gagliano's Interest in L&S. Appellants asked the

trial court to find as a matter of law that an "Unresolved Dispute" under the Company Agreement is simply a dispute that has not been resolved and that "cash" includes a cashier's check and does not only mean "dollar bills." Appellants explained that while the parties briefed the issues in the context of motions for summary judgment and L&S's Plea to the Jurisdiction, neither party asked the trial court to answer a pure question of law and interpret the contract, which Texas Rule of Civil Procedure 166(g) enables the trial court to do. Appellants also filed supplements to their motions under Rule 166(g).

The trial court conducted a pretrial hearing on Appellants' motions under Texas Rule of Civil Procedure 166(g). During the hearing, Appellants argued that neither party claimed the Company Agreement was ambiguous, and they suggested that should the trial court find that Burkett purchased Gagliano's membership interest, that finding would resolve Gagliano's and Tactical's claims. On the other hand, since the trial court declined to grant the Appellants' motion and declined to find that Burkett's ownership interest had been redeemed as a matter of law, Tactical's third-party beneficiary issue became relevant, as did questions about Burkett's subsequent decision to amend the Company Agreement and to remove the provision in the Company Agreement that provided Tactical with a right of first refusal on manufacturing control panels sold by L&S.

Appellants argued that Burkett made an offer to buy Gagliano's membership interest under section 12.7 of the Company Agreement, waited sixty days, and tendered a cashier's check to Gagliano's counsel. They explained that under the terms of the Company Agreement, Gagliano had the option to buy Burkett's membership interest by offering to pay three times Burkett's offer. But when Gagliano failed to respond to Burkett's offer by offering to buy Burkett's shares, under the terms of the Company Agreement Gagliano is deemed to have accepted Burkett's offer to buy Gagliano's shares. Appellants argued that the disputed issue was whether under section 12.7 there was an "Unresolved Dispute," a term the Company Agreement defines as a dispute that is unresolved after mediation. Appellants argued that the case remained unresolved after two mediations, and that Burkett made his offer after the second mediator's joint proposal was not accepted. Appellants also claimed that because Burkett's cashier's check satisfied the "cash" requirement under section 12.7 of the Company Agreement, when the period expired for Gagliano to respond to Burkett's offer, Gagliano's membership interest in L&S was redeemed by Burkett.

Appellees explained that in a prior hearing, the trial court had denied the parties' cross-motions for summary judgment on the issue of Burkett's purchase of Gagliano's interest in L&S. Appellees asked the trial court to revisit its rulings on those motions. Appellees argued that since Appellants failed to show that a mediator

had declared an impasse, and because Appellants had not tendered the payment for Gagliano's interest in cash, the Appellants had failed to show that Burkett bought Gagliano out under the terms of the Company Agreement.

The trial judge stated he did not need to look at the impasse part because "[n]o mediator has said there is no possibility of settlement through mediation." The judge also noted that section 12.7(a) of the Company Agreement is unambiguous and does not state there must be an impasse. Rather, what section 12.7(a) says is, "the parties must try and resolve their dispute through a mediation until . . . a mediator makes a good faith finding there is no possibility of settlement through mediation." The trial court also noted that it appeared the mediator was uncomfortable with finding no possibility of settlement existed through mediation.

In response to the trial court's observations, the Appellants raised four arguments. First, they argue the Company Agreement doesn't require a formalized finding of impasse, and instead all that was needed was a generalized finding, which was made clear given the time that passed after two mediations that were not successful and the fact that the parties proceeded to trial. Second, they claimed that section 12.7(a) of the Company Agreement required the parties to mediate their disputes, but that section 12.7(b) addressed what occurred if the dispute remained unresolved after it arose for a period of exceeding two years. Third, Appellants suggested that the "no possibility of settlement" language in section 12.7(a) does not

apply when the buy-out provision applicable to Unresolved Disputes in section 12.7(b) of the Company Agreement is exercised. Fourth, they argued that an Unresolved Dispute under the Company Agreement includes a dispute that remains unresolved after mediation regardless of whether the mediator has made a no possibility of settlement finding. Appellants also requested that the trial court rule on whether a cashier's check satisfied section 12.7(b)'s requirement that the purchase price, if the parties cannot agree, "be payable in cash at closing."

Turning to the Appellants' Motion Under Rule 166(g) in which it argued that Tactical was not a third-party beneficiary of the Company Agreement between Burkett and Gagliano, Appellants explained that Tactical relied on the Company Agreement by claiming L&S had breached it and that under the Company Agreement, it had rights it could enforce under the agreement to provide control panels for the products sold to third-parties in the product lines manufactured by L&S. When L&S did not honor its obligation to allow Tactical to provide these control panels, Tactical claims, it lost revenues that it otherwise would have received from the sales and installation of these panels into product lines sold to third parties by L&S.

According to Appellants, since Tactical was a stranger to the Company Agreement, its right to sue depends on whether it is a third-party beneficiary to the agreement, and there was a presumption against conferring third-party beneficiary

34

status on noncontracting parties. Appellants argued that in its response to the Appellants' plea to the jurisdiction, Tactical admitted that it is not a creditor beneficiary to the Company Agreement. Appellants also claim that Tactical cannot demonstrate that it is a donee beneficiary because it cannot show that the Appellants' purchases of control panels from Tactical, when they occurred or when they were to occur, were pure donations. Appellants also asserted that absent Tactical's third-party beneficiary status under the Company Agreement, Tactical has no basis on which to assert a breach of contract claim under the Company Agreement while Gagliano was an owner of L&S. In other words, the purpose of the provisions that are in the Company Agreement that are tied to Tactical are there solely for Gagliano's benefit as an owner of L&S, and the parties to the agreement did not intend to make Tactical a third-party beneficiary of the Company Agreement based on the benefit the provisions gave Gagliano given the ownership interest that he had in Tactical.

Appellees argued that the Company Agreement's plain language, including a provision providing Tactical with the right of first refusal to install control panels in L&S products within the restrictions of the Company Agreement shows that Tactical was an intended beneficiary under the Company Agreement. Appellees noted that Burkett unilaterally amended the Company Agreement and removed the right of first

refusal provision from the Company Agreement while Gagliano still owned an interest in L&S.

After considering that parties' arguments, the trial court: (1) found the Company Agreement unambiguous; (2) citing section 8.4(d)(v) of the Company Agreement, found Tactical to be a third-party beneficiary of the Company Agreement, and gave Tactical the right to enforce the right of first refusal in section 8.4; and (3) found that due to the mediator's failure to make a good faith finding that the case could not be resolved by mediation and there was no unresolved dispute, determined there was a failure in a condition precedent to Burkett's invoking the Push-Pull clause, section 12.7, and found that Burkett's attempt to purchase Gagliano's interest in L&S to be invalid. After the trial court signed a summary-judgment order consistent with its rulings, Appellants filed Motions to Reconsider, but its motions were denied.

Subsequently, the case proceeded to trial. At the conclusions of the trial, the jury found that: (1) L&S failed to comply with the Company Agreement; (2) Burkett failed to comply with the Company Agreement; (3) Gagliano did not fail to comply with the Company Agreement; (4) L&S's failure to comply was not excused; (5) Burkett's failure to comply was not excused; (6) Gagliano was entitled to $2,638,101.05 in unpaid distributions for breach of contract damages due to L&S's and Burkett's failure to comply with the Agreement; (7) Tactical was entitled to

36

$2,389,725.29 in past lost profits for breach of contract damages due to L&S's and Burkett's failure to offer control panel and systems work to Tactical; (8) Gagliano was entitled to $1,261,000 in attorney's fees for Gagliano's breach of contract claims, $291,000 for representation through appeal to the court of appeals, and $97,000 for representation in the Supreme Court of Texas; (9) Burkett failed to comply with his fiduciary duty to L&S; (10) Burkett's decisions and expenses were not protected by the Texas Business Judgment Rule; (11) Gagliano, standing in the shoes of L&S, was entitled to $525,337.11 in damages for payments L&S made to Burkett and others for Burkett's personal expenses; (12) L&S must pay Tactical $2,389,725.29 as a result of Burkett causing L&S to breach its contract with Tactical; (13) Gagliano, standing in the shoes of L&S, was entitled to $2,638,101.05 in unpaid distributions for breach of contract damages; (14) the harm to L&S as a result of Burkett's breach of fiduciary duty resulted from malice, gross negligence, and intentional self-enrichment; (15) Gagliano, standing in the shoes of L&S, was entitled to $15,106,326 as exemplary damages because of Burkett's malicious, grossly negligent, and intentionally self-enriching breach of fiduciary duty; (16) Gagliano did not fail to comply with his fiduciary duty to L&S; (17) Burkett failed to comply with his fiduciary duty to Gagliano; (18) Gagliano was entitled to $2,638,101.05 in unpaid distributions for damages because of Burkett's breach of his fiduciary duty; (19) the harm to Gagliano resulted from malice, gross negligence,

37

and intentional self-enrichment attributable to Burkett's breach of fiduciary duty; (20) Gagliano was entitled to $10,000,000 as exemplary damages from Burkett because of Burkett's malicious, grossly negligent, and intentionally self-enriching breach of fiduciary duty; (21) a relationship of trust and confidence existed between Burkett and Gagliano; (22) Burkett failed to comply with his fiduciary duty to Gagliano; (23) Gagliano was entitled to $2,638,101.05 in unpaid distributions based on Burkett's breach of his fiduciary duty; (24) Gagliano was entitled to $525,337.11 for payments L&S made to Burkett and others for Burkett's personal expenses; (25) L&S must pay Tactical $2,389,725.29 as a result of Burkett's causing L&S to breach with Tactical; (26) the harm to Gagliano as a result of Burkett's breach of fiduciary duty resulting from malice, gross negligence, and intentional self-enrichment attributable to Burkett; (27) Gagliano was entitled to $15,106,326 in exemplary damages because of Burkett's malicious, grossly negligent, and intentionally self-enriching breach of fiduciary duty; (28) Burkett committed a Terminating Event under the Company Agreement; (29) for representing Gagliano against Burkett's failed request for a declaration tied to his attempt to exercise his rights under Section 12.7(b) of the Company Agreement, Gagliano was entitled to $1,170,000 in attorney's fees through trial, $270,000 through appeal, $45,000 for representation at the petition for review stage of the Supreme Court, $22,500 for merits briefing stage in the Supreme Court, and $22,500 for representation through oral argument and

38

completion of proceedings in the Supreme Court; (30) L&S failed to comply with its Commercial Lease Agreement with Snook; (31) Snook was entitled to $104,139.12 in damages for past property repairs and $5,100 for erecting a privacy fence; (32) for representing Snook, Snook is entitled to recover $39,000 in reasonable and necessary attorney's fees through trial on his claim alleging that L&S failed to comply with its Commercial Lease Agreement, plus an additional $9,000 in attorney's fees for appeal to the court of appeals, $1,500 for petition for review stage, $750 for merits briefing, and $750 through oral argument; (33) for representing Gagliano on his claims against L&S, Gagliano is entitled to recover $30,000 in attorney's fees through trial for defending L&S's claim for theft under the Texas Theft Liability Act, plus an additional $6,912 in attorney's fees for appeal to the court of appeals, $1,152 for petition for review stage, $576 for merits briefing, and $576 through oral argument; (34) for representing Gagliano on his declaratory judgment claims against Burkett and L&S, Gagliano is entitled to recover reasonable and necessary attorney's fees of $1,170,000 in attorney's fees through trial plus an additional $270,000 in attorney's fees for appeal to the court of appeals, $45,000 for petition for review stage, $22,500 for merits briefing, and $22,500 through oral argument; (35) for representing Gagliano on his claim against Burkett, Gagliano is entitled to recover reasonable and necessary attorney's fees of $1,170,000 through trial, plus an additional $270,000 for appeal to the court of appeals, $45,000 for

petition for review stage, $22,500 for merits briefing, and $22,500 through oral argument; (36) Gagliano is entitled to be indemnified or reimbursed under Section 14.1 of the Company Agreement; and (37) Gagliano incurred a total of $1,170,000 in reasonable attorney's fees in this proceeding through trial along with $113,190 in court costs and fees and was entitled to $270,000 for appeal to the court of appeals, $45,000 for petition for review stage, $22,500 for merits briefing, and $22,500 through oral argument.

The trial court accepted the jury's verdict and incorporated the findings into the Final Judgment, including its pretrial dispositive rulings that Burkett's purported exercise of Section 12.7(b) of the L&S Company Agreement was ineffective and Tactical is a third-party beneficiary of the Company Agreement. The trial court conducted a hearing on the entry of the Final Judgment and asked whether the Appellees had made their elections. Appellees responded that they had provided the court with binding authority stating that "what goes to the appellate review is the final judgment with all of the bases and the Appellate Court can sustain this jury's work on any one of the different bases for liability, be it breach of contract or fiduciary duty or otherwise." Appellees' counsel explained that if Appellants were concerned over double or multiple recoveries, the trial court retained plenary jurisdiction to enforce its judgment, and the court could ensure that no double recovery was allowed or one that exceeded what the Court of Appeals would

authorize. In response, Appellants' counsel argued that a plaintiff must elect their remedies after verdict and before the judgment was entered, and the judgment contains four categories of actual damages including (1) distributions to Gagliano, (2) damages to Tactical, (3) Burkett's personal expenditures, and (4) Snook's damages. The damages are owed by either Burkett or L&S but not both. Appellees' counsel maintained that when a jury returns favorable findings on two or three alternative theories, the prevailing party need not formally waive the alternative findings and may seek recovery under an alternative theory should the judgment be reversed on appeal. Appellants' counsel explained that the judgment just needed to contain alternative language concerning the theories of recovery.

The Final Judgment "DECLARES, ORDERS, ADJUDGES, DECREES, AND ENTERS JUDGMENT" against L&S Pro-Line and to Gagliano for breach of contract in the amount of $2,638,101.05; against L&S Pro-Line and to Tactical for breach of contract in the amount of $2,389,725.29; against L&S Pro-Line and to Snook for breach of contract in the amount of $109,239.12; against Burkett and to Gagliano for breach of contract in the amount of $2,638,101.05; against Burkett and to Tactical for breach of contract in the amount of $2,389,725.29; against Burkett and to Gagliano for breach of fiduciary duty in the amount of $5,553,163.45; against Burkett and to Gagliano as punitive damages for Burkett's malicious, grossly negligent and intentionally self-enriching breach of fiduciary duty in the amount of

41

$5,276,202.10; against Burkett and to Gagliano, standing in the shoes of L&S, for breach of fiduciary duty in the amount of $5,553,163.85; against Burkett and to Gagliano, standing in the shoes of L&S as punitive damages for Burkett's malicious, grossly negligent and intentionally self-enriching breach of fiduciary duty in the amount of $11,106,329.70; against L&S and to Gagliano for reasonable and necessary legal fees in the amount of $1,170,000; against Burkett and to Gagliano for reasonable and necessary legal fees in the amount of $1,170,000 and for reasonable and necessary appellate fees; against L&S and to Gagliano for reasonable and necessary court costs in the amount of $113,190 and for reasonable and necessary appellate fees; against L&S and to Gagliano for additional reasonable and necessary legal fees incurred in proceeding to defend and prevail against L&S's theft claim in the amount of $30,000 and reasonable and necessary appellate fees; and against L&S and to Snook for reasonable and necessary legal fees in the amount of $39,000 and for reasonable and necessary appellate fees.

Appellants filed a Motion for Judgment Notwithstanding the Verdict, arguing there was no evidence to support any elements of Gagliano's and Tactical's claims or any awarded damages. Appellants asked the trial court to set aside the jury's verdict and render judgment in their favor because: (1) there is insufficient evidence to demonstrate that Appellants failed to comply with the Company Agreement by not paying Gagliano distributions because Gagliano was not a member of L&S after

42

June 11, 2019; and (2) because Tactical did not have standing to assert a breach of contract claim under the Company Agreement. Appellants complained that no evidence supported the jury's damages awards for unpaid distributions to Gagliano and lost profits to Tactical, and that the responses by the jury to the question on attorney's fees were unsupported by legally sufficient evidence. Appellants also complained the evidence was insufficient to support the jury's answers to the questions about whether Burkett had failed to comply with his fiduciary duties to L&S and Gagliano. And Burkett also argues that the jury's failure to find that the decisions he made while acting as an officer, director, or manager of L&S is against the greater weight and preponderance of the evidence under the Business Judgment Rule. Appellants also argue the evidence is insufficient to support the jury's damages awards, and that the trial court's judgment violates the one satisfaction rule by allowing Appellees, Gagliano and Tactical, a double, triple, or even greater recovery. Appellants also challenged the legal sufficiency of the evidence supporting the "excessive" punitive damages award, that Burkett committed a Terminating Event under the Company Agreement, and that L&S failed to comply with its commercial lease with Snook.

Appellees filed a Response to Appellants' Motion for Judgment Notwithstanding the Verdict, arguing that Appellants were attempting to "rehash" the trial court's prior rulings, and they were not entitled to a judgment as a matter of

law on any grounds asserted. Appellants filed a Motion for New Trial asking the trial court to disregard the jury's findings and grant them a new trial, which was overruled by operation of law.

## ANALYSIS

### Issues One and Two: Summary Judgment

Appellants complain that erroneous pre-trial rulings significantly impacted the scope of the trial. In issue one, Appellants argue the trial court erred by holding that Burkett did not purchase Gagliano's membership interest under the Company Agreement. Appellants argue this Court should determine these issues as a matter of law and reverse and remand the breach of contract question so it may be tried in the correct procedural posture. In issue two, Appellants assert the trial court erred by holding Tactical was a third-party beneficiary of the Company Agreement with standing to sue.

We review summary judgment orders de novo. *Provident Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 215 (Tex. 2003). The party moving for traditional summary judgment must establish that (1) no genuine issue of fact exists, and (2) it is entitled to judgment as a matter of law. Tex. R. Civ. P. 166a(c); *Randall's Food Mkts., Inc. v. Johnson*, 891 S.W.2d 640, 644 (Tex. 1995). If the moving party produces evidence entitling it to summary judgment, the burden shifts to the non-movant to present evidence that raises a fact issue. *Walker v. Harris*, 924 S.W.2d

375, 377 (Tex. 1996). In determining whether there is a disputed material fact issue precluding summary judgment, evidence favorable to the nonmovant will be taken as true. *Nixon v. Mr. Prop. Mgmt. Co.*, 690 S.W.2d 546, 548–49 (Tex. 1985). We review the summary judgment record "in the light most favorable to the nonmovant, indulging every reasonable inference and resolving any doubts against the motion." *City of Keller v. Wilson*, 168 S.W.3d 802, 824 (Tex. 2005); *see also Mosaic Baybrook One, L.P. v. Simien*, 674 S.W.3d 234, 252 (Tex. 2023) (citation omitted).

When both parties move for summary judgment on the same issue and the trial court grants one motion and denies the other, the reviewing court considers the summary judgment evidence presented by both parties and determines all the questions presented. *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 848 (Tex. 2009). If the reviewing court determines that the trial court erred, the reviewing court renders the judgment the trial court should have rendered. *Id.* We must affirm the summary judgment if any grounds asserted in the motion are meritorious. *Tex. Workers' Comp. Comm'n v. Patient Advocates of Tex.*, 136 S.W.3d 643, 648 (Tex. 2004). When, as here, a trial court orally grants summary judgment on a particular basis but reduces that ruling to writing without stating any basis, the trial court's written judgment controls, and the appellant must show that the trial court erred to base the summary judgment on every ground asserted in the motion. *See Star-Telegram v. Doe*, 915 S.W.2d 471, 473 (Tex. 1995); *Gonzales v. Thorndale*

45

*Coop. Gin and Grain Co.*, 578 S.W.3d 655, 657–58 (Tex. App.—Houston [14th Dist.] 2019, no pet.) (citations omitted) (explaining that appellate courts look to the trial court's formal summary-judgment order to determine the trial court's grounds, if any, for the ruling).

Whether a contract is ambiguous is a question of law for the court and is subject to de novo review. *Bowden v. Phillips Petroleum Co.*, 247 S.W.3d 690, 705 (Tex. 2008). To determine whether a contract is ambiguous, a court looks at the contract as a whole and considers the circumstances at the time of the agreement. *Sadler Clinic Ass'n, P.A. v. Hart*, 403 S.W.3d 891, 895 (Tex. App.—Beaumont 2013, pet. denied) (citation omitted). A court attempts to give effect to the parties' intent as expressed in the agreement. *Id.* An ambiguity does not exist simply because the parties offer conflicting interpretations of an agreement. *See id.* If an agreement can be given a clear and definite legal meaning, then it is not ambiguous as a matter of law. *See id.*; *see also Zarkasha Enter., Inc. v. Old Republic Title Ins. Co. of Conroe*, No. 09-20-00057-CV, 2021 WL 3774710, at *11 (Tex. App.—Beaumont Aug. 26, 2021, no pet.) (mem. op.) (citations omitted). That said, if an agreement contains an ambiguity, summary judgment is improper because interpretation of the contract is a fact issue. *See Coker v. Coker*, 650 S.W.2d 391, 394 (Tex. 1985); *see Zarkasha Enter., Inc.*, 2021 WL 3774710, at *11.

**Issue One: Did the summary judgment evidence prove as a matter of law that Burkett did not purchase Gagliano's Membership Interest under the Company Agreement?**

In issue one, Appellants complain the trial court erred in finding as a matter of law that Burkett failed to successfully purchase Gagliano's membership interest in L&S. Appellants argue the Company Agreement does not require a formalized finding of impasse, only a general finding that there is no possibility of settlement. Appellants argue that there was an impasse since the parties were unable to settle after two mediations, and Burkett rightfully moved under the Company Agreement to purchase Gagliano's 25% interest and this Court should declare Burkett the 100% owner of L&S.

In his Traditional Motion for Partial Summary Judgment, Gagliano argued that Burkett's attempt to exercise the Push Pull provision was ineffective due to his prior material breaches and failure to follow the buyout procedures requiring (1) a good faith finding of no possibility of settlement by the mediator, (2) closing on the sixtieth day after delivery of the Purchase Notice, and (3) payment in cash at closing.

Section 12.7 of the Company Agreement, The Disputes and Push Pull, states:

> (a)    At any time of a disagreement between the Members on any material matter affecting the Company in a material way economically and financially, if such a deadlock is not resolved by informal negotiations among the Members (the "**Disputants**"), and such dispute can be reasonable [sic] anticipated to have a material adverse effect on the financial interests of the Company ("a **Dispute**"), any Member shall be entitled to demand in writing that the Managers

47

engage a professional mediator to assist in the negotiation and mediation of the relevant Dispute. The Disputants shall attempt to select a mutually acceptable mediator, who shall be a person who has requisite training and accreditation as a mediator to determine, understand and analyze the dispute between the parties.... The mediation process shall commence within thirty (30) days after written request therefor, and shall continue until the controversy is resolved or the mediator makes a good faith finding that there is no possibility of settlement through mediation. All costs and expenses of the mediator shall be shared equally by the Disputants (any dispute being unresolved after mediation being an "**Unresolved Dispute**").

(b)     After the expiration of two (2) years from the effective date of this Agreement, [April 12, 2016] any "Disputant" (an "**Initiating Member**") may, upon an Unresolved Dispute occurring, give written notice to the Members and Managers regarding another Disputant Member (the "**Responding Member**") stating that the Initiating Member desires to invoke this Section and purchase all (but not less than all) of the Units of the other Member (the "**Purchase Notice**"), and such notice shall constitute an unconditional and irrevocable commitment by the Initiating Member to purchase the Units of the Responding Member. The Purchase Notice shall set forth the price per Unit at which the Initiating Member is willing to purchase all, and not less than all, of the Interest of the Responding Member. The Responding Member shall thereafter have thirty (30) days from the receipt of the Purchase Notice in which to elect by written notice to all Members and Managers to purchase all of the Interests of the Initiating Member at that same price per Unit set forth in the "**Buy-Sell Notice**" or sell its ownership Interest at the price set forth in the Buy-Sell Notice. Failure of a Responding Member to make and deliver a written election to purchase all the Interests of the Initiating Member at the price per Unit set forth in the Buy-Sell Notice shall be deemed an election by the Responding Member to sell its Interests to the Initiation Member at such price.

The closing shall be held on the (60th) day after the delivery of the Purchase Notice to the Responding Member, or such other date as mutually agreed upon by the Responding and Initiating Members. The purchase consideration shall be payable in such manner as the parties

48

may agree, or if they cannot agree prior to closing, then the purchase price shall be payable in cash at closing.

(Emphasis added.) Section 15.13, entitled Mediation, provides, "The mediation process shall continue until the controversy is resolved or the mediator makes a finding that there is no possibility of settlement through mediation **or any Disputant chooses not to continue further**." (Emphasis added.)

In June 2018, L&S filed Plaintiff's Original Petition. The summary judgment evidence shows that Burkett and Gagliano did not resolve their "**Dispute**" after two mediations. More specifically, the records show that on July 17, 2018, Burkett and Gagliano agreed to mediate with Alan Levin, and the mediation ended without them resolving their "Dispute." Also, in April 2019, Burkett and Gagliano mediated with the Honorable Sylvia Matthews, and the parties again failed to resolve their "Dispute." Gagliano alleged that the mediator did not make a good faith finding that settlement would not be possible. However, at the end of the second mediation, and before releasing the parties from the mediation, Judge Matthews prepared and submitted a mediator's proposal to both parties as a last and final attempt to settle the parties' "Dispute," but since it was not mutually accepted by both parties, the mediation failed. Therefore, we conclude that after two failed mediations and under the unambiguous language of the Company Agreement, an "**<u>Unresolved Dispute</u>**" existed following the second failed mediation in April 2019.

Following the second failed mediation, neither party demanded in writing that another mediator be engaged to attempt to further mediate the "Dispute," and no one demanded in writing that parties return to either Levin or Matthews for additional mediation proceedings. Simply put, no one demanded further proceedings pursuant to the mediation provision in section 12.7(a) of the Company Agreement. And while Section 15.13 of the Company Agreement requires a finding by the mediator that there is no possibility of settlement, it does not require the finding to be in writing. And importantly, Section 15.13 goes on to provide an alternative to a mediator's making a finding if a "Disputant chooses not to continue further[,]" which is what both parties did here. We conclude the record shows as a matter of law that the parties—certainly Burkett—chose not to continue further, which in our opinion rendered the need for a mediator's finding (written or implied) a moot issue.

On April 12, 2019, Burkett, as a "Disputant" (and as an "Initiating Member") upon the "Unresolved Dispute" occurring between the parties, acted within his rights under the Company Agreement by invoking section 12.7(b) by providing Gagliano's counsel written notice (the "Purchase Notice") of his intent to purchase Gagliano's membership interest in L&S under the Company Agreement. In the notice, Burkett requested that Gagliano respond no later than May 13, 2019, as required by section 12.7(b). By invoking section 12.7(b), Burkett was electing the Push-Pull's buy-out

provision and rejecting any further efforts to mediate the parties' "Unresolved Dispute."

Under the unambiguous language of Section 12.7(b) of the Company Agreement, Gagliano had two choices: (1) as the "Responding Member", he had thirty (30) days from the receipt of the "Purchase Notice" to elect by written notice to the "Initiating Member" (Burkett) that he would purchase Burkett's entire interest in L&S at that same price per Unit that Burkett set forth in his "Buy-Sell Notice," **or** Gagliano could sell his interest in L&S to Burkett at the price set forth in the "Buy-Sell Notice." That said, Gagliano didn't respond to Burkett's notice by the May 13, 2019 deadline. Therefore, pursuant to the unambiguous language in section 12.7(b) stating that the "[f]ailure of a Responding Member to make and deliver a written election . . . shall be deemed an election by Responding Member to sell its Interest to the Initiating Member at such price[,]" we conclude that Gagliano is deemed to have made an election to sell his interest in L&S after failing to respond within the 30-day deadline for the consideration stated in the notice.

Relying on section 12.7(b) and the fact that Gagliano had failed to respond to his buy-sell notice, on May 14, 2019, Burkett's counsel sent a letter to Gagliano's counsel enclosing a cashier's check for $1,300,000. In the letter, Burkett's counsel stated that "under the express terms of the Operating Agreement, Gagliano is deemed to have accepted Initiating Member Lee Burkett's offer[.]" After Gagliano's

51

counsel received the letter, Gagliano's counsel acknowledged in writing receiving the cashier's check on Gagliano's behalf. On June 11, 2019, Gagliano and his counsel went to Burkett's counsel's office to receive cash at closing, and Burkett's counsel presented them with a letter without presenting any cash in exchange for the cashier's check, which Gagliano had not requested, and Burkett testified that he considered the transaction closed on that date.

The evidence shows that the parties agreed to close on June 11, 2019, which was sixty days after Burkett delivered the Purchase Notice to Gagliano; however, on May 14, 2019, Gagliano's counsel received a cashier's check for $1,300,000. The summary judgment evidence establishes that before the date the transaction closed, Gagliano's counsel received the cashier's check tendered in payment for Gagliano's interest in L&S. Before the transaction closed, the evidence does not show that Gagliano ever complained about the fact that the consideration tendered was in the form of a cashier's check. Section 12.7(b) provides that the purchase price shall be payable in cash at closing if the parties cannot agree on the form in which the consideration is to be paid before closing, and there is no such evidence here. Since there is no evidence that Gagliano did not agree to accept a cashier's check prior to the date the transaction closed, we conclude that Burkett did not violate section 12.7(b) by failing to tender cash in lieu of the cashier's check for Gagliano's shares in L&S.

Turning next to Gagliano's argument that Burkett's attempt to exercise the Push-Pull provision was ineffective based on his claim that Burkett had materially breached the Company Agreement before exercising his option under the Push-Pull, Section 12.7(b) defines an "Unresolved Dispute." Section 12.7(b) anticipates that the parties to the Company Agreement are in conflict, but it does not require any conditions for Burkett as the Initiating Member to invoke the section, including that the Initiating member not be in material breach of the Company Agreement before they exercise their option under the Push-Pull. For instance, even if the Initiating Member was in breach, the breach could be waived by the Responding Member by accepting the offer made by the Initiating Member who exercised the Push-Pull.

Additionally, section 12.7(b) does not require the parties to resolve their "Unresolved Disputes" before the closing date, including paying any unpaid distributions. It merely provides the procedure for Burkett to buy Gagliano's Interest at the price per unit set forth in the Buy-Sell Notice after Gagliano failed to timely make and deliver a written election to purchase all Burkett's Interests, which was then deemed Gagliano's election to sell his Interest at the Initiating Member's price. Based on the language in the Company Agreement and for the reasons explained above, we conclude the trial court erred by granting Gagliano's Traditional Motion for Partial Summary Judgment and finding that Burkett's purchase of Gagliano's Membership Interest was ineffective.

We sustain Appellants' first issue and vacate that portion of the trial court's judgment granting Gagliano's Motion for Partial Summary Judgment and holding that Burkett's purported exercise of Section 12.7(b) of the L&S Company Agreement was ineffective. Having concluded that the trial court erred, we render the judgment the trial court should have rendered and conclude as a matter of law that Burkett effectively exercised Section 12.7(b) of the L&S Company Agreement. *See Fielding*, 289 S.W.3d at 848.

## Issue Two: Did the summary judgment evidence prove as a matter of law that Tactical is a Third-party Beneficiary of the Company Agreement?

In issue two, Appellants complain the trial court erred by holding that Tactical was a third-party beneficiary of the Company Agreement with standing to sue. Appellants argue that Tactical lacks standing to assert a breach of contract claim because it is not a party to the Company Agreement and because Tactical cannot overcome the presumption against conferring third-party beneficiary status on noncontracting parties. Appellants also argue that Tactical cannot enforce the Company Agreement because it is neither a donee nor a creditor beneficiary under that agreement.

Section 4.1 of the Company Agreement states that the specific purpose of L&S "is to engage in the assembly and sale of skids, buildings, enclosures, housings, and similar products for the well site hydrocarbon transportation, metering, and

processing infrastructure in the United States (the "Business")." The Company

Agreement provides that L&S has two Members, Burkett and Gagliano, who own

Interests in the company. Section 8.2 of the Company Agreement states that Burkett

is the Executive Manager, and Section 8.4 of the Company Agreement, entitled

Powers of Executive Manager and Managers, provides that Gagliano is the Tax

Matters Manager, Company's Treasurer, and Chief Financial Officer. Although

subject to exceptions, Section 8.4(d)(v) of the Company Agreement gives Tactical a

right of first refusal to build control system panels that are then installed in products

manufactured by L&S and then sold by L&S to third parties. Section 8.4(d)(v) states:

> The parties agree that to the extent that any product, housing, building, skids, enclosures, or similar products assembled, manufactured, fabricated or otherwise sold by the Company to third parties will contain a control system of panels, the same shall be provided by TACTICAL AUTOMATION, LLC, an Affiliate of GAGLIANO, unless TACTICAL AUTOMATION, LLC, is (i) no longer affiliated with GAGLIANO, (ii) declines to provide the same, (iii) unable to offer same at competitive rates, (iv) unable to make delivery times required by the Company's customer, (v) otherwise unable to make such a control system on a competitive basis or, if by virtue of its inclusion in the Company's products, the Company's products become uncompetitive. In the event any of these circumstances situations occur Company shall be free to source a control system of panels from any vendor, until the above-referenced circumstances cease. In the event TACTICAL AUTOMATION is no longer owned or controlled by GAGLIANO, this section shall be null and void. GAGLIANO agrees to, for so long as he owns a controlling management interest therein, to the extent TACTICAL AUTOMATION, LLC, will provide such a product to the Company, that the same shall be provided on commercially reasonable terms and at non-discriminatory prices to the Company. To the extent that a

customer of the Company requires a third party provide control systems or panels related to a Company product, the Company shall disclose the same to GAGLIANO and with GAGLIANO's consent, which will not be unreasonably withheld, the Company shall be entitled, to satisfy that customer, to use the required third party control systems of panels.

Appellants' Plea to the Jurisdiction, Traditional and No-Evidence Motion for Partial Summary Judgment, and Motion Under Rule 166(g) included the argument that Tactical lacked standing because it was not a third-party beneficiary of the Company Agreement between Burkett and Gagliano. Appellants argued that the plain language of the Company Agreement does not show that Gagliano and Burkett intended to give Tactical the right to enforce the Company Agreement.

Standing is a constitutional prerequisite to filing suit. *Heckman v. Williamson Cnty.*, 369 S.W.3d 137, 150 (Tex. 2012). "To establish standing to assert a breach of contract cause of action, a party must prove its privity to the agreement or that it is a third-party beneficiary." *Maddox v. Vantage Energy, LLC*, 361 S.W.3d 752, 756 (Tex. App.—Fort Worth 2012, pet. denied) (citations omitted); *see also Debes v. General Star Indem. Co.*, No. 09-12-00527-CV, 2014 WL 3384679, at *2 (Tex. App.—Beaumont July 10, 2014, no pet.) (mem. op.) (citations omitted). "A third party may recover on a contract made between other parties only if the parties intended to secure some benefit to the third party, and only if the contracting parties entered into the contract directly for the third party's benefit." *Basic Cap. Mgmt. v. Dynex Com., Inc.*, 348 S.W.3d 894, 900 (Tex. 2011). When a contract only confers

56

an indirect, incidental benefit, a third party cannot enforce the contract. *Tawes v. Barnes*, 340 S.W.3d 419, 425 (Tex. 2011) (citation omitted). There is a presumption against conferring third-party beneficiary status on noncontracting parties, and "[a]ll doubts must be resolved against conferring third-party beneficiary status." *Id.*; *S. Tex. Water Auth. v. Lomas*, 223 S.W.3d 304, 306 (Tex. 2007).

To create a third-party beneficiary, the contracting parties must have intended to grant the third party the right to be a claimant in the event of a breach. *See Corpus Christi Bank & Tr. v. Smith*, 525 S.W.2d 501, 505 (Tex. 1975). To determine whether the parties intended to directly benefit a third party and contracted for that purpose, courts must look solely to the contract's language, construed as a whole. *First Bank v. Brumitt*, 519 S.W.3d 95, 102 (Tex. 2017). When construing an unambiguous contract, the construction of the written agreement is a question of law for the court. *Dynex Com., Inc.*, 348 S.W.3d at 900 (citation omitted). Absent clear and unequivocal expression of the contracting parties' intent to directly benefit a third party, courts will not confer third-party beneficiary status by implication. *MCI Telecomms. Corp. v. Tex. Utils. Elec. Co.*, 995 S.W.2d 647, 651 (1999); *see also Brumitt*, 519 S.W.3d at 103. Courts may not presume the necessary intent, and a presumption exists that the parties contracted for themselves unless it appears that they intended a third party to benefit from the contract. *Brumitt*, 519 S.W.3d at 103; *Dynex Com., Inc.*, 348 S.W.3d at 900 (citation omitted). A party receiving only an

incidental benefit from a contract does not give the party a right to enforce the contract. *Stine v. Stewart*, 80 S.W.3d 586, 589 (Tex. 2002).

The three types of third-party beneficiaries include donee, creditor, and incidental beneficiaries. *Esquivel v. Murray Guard, Inc.*, 992 S.W.2d 536, 543 (Tex. App.—Houston [14th Dist.] 1999, pet. denied). To assert a breach of contract claim as a third-party beneficiary, the party must show that it is either a donee or creditor beneficiary to the contract. *Id.* A party is a donee beneficiary only if a donative intent expressly or impliedly appears in the contract. *Id.* In other words, a party "is a donee beneficiary if the performance of the contract inures to his benefit as a gift." *Allan v. Nersesova*, 307 S.W.3d 564, 571 (Tex. App.—Dallas 2010, no pet.). Thus, if the party must provide some consideration or exchange to benefit from the contract, the performance promised will not come as a pure donation and the party is not a donee beneficiary. *See Maddox*, 361 S.W.3d at 759. Since Tactical had to provide L&S with finished control panels and satisfy other conditions to benefit from the Company Agreement, which was to receive L&S's control panel work, Tactical is not a donee beneficiary under the Company Agreement.

A party is a creditor beneficiary if no intent to make a gift appears in the contract, but performance will satisfy an actual or asserted duty of the promisee to the beneficiary, such as indebtedness, contractual obligation, or other legally enforceable commitment to the third party. *Esquivel*, 992 S.W.2d at 543–44. "The

58

promisee must intend that the beneficiary will have the right to enforce the contract." *Id.* at 544 (citation omitted). "The intent to confer a direct benefit upon a third party 'must be clearly and fully spelled out or enforcement by the third party must be denied.'" *Lomas*, 223 S.W.3d at 306 (quoting *MCI Telecomms. Corp.*, 995 S.W.2d at 651). Not only did Tactical admit in its Response to Appellants' Plea to the Jurisdiction that Tactical's role in the Company Agreement fits the definition of donee beneficiary and not creditor beneficiary, here, the evidence established as a matter of law that Tactical was a stranger to the Company Agreement, and that it was not a donee or creditor beneficiary of the Company Agreement, as L&S did not owe an actual indebtedness, contractual obligation, or other legally enforceable commitment to Tactical. *See Esquivel*, 992 S.W.2d at 543–44. Nor does the Company Agreement clearly and unequivocally express an intent by the parties for Tactical to have the right to enforce the Company Agreement, and a court may not presume that the parties to a contract intended to bestow a benefit on a stranger to it. *See Brumitt*, 519 S.W.3d at 103; *MCI Telecomms. Corp.*, 995 S.W.2d at 651.

Section 8.4(d)(v) of the Company Agreement states that if Tactical is no longer owned or controlled by Gagliano, this section shall be "null and void." According to the Company Agreement's express language, the parties intended for Gagliano to benefit from the provision to give Tactical control panel work, and we presume that the parties contracted for themselves. *See Brumitt*, 519 S.W.3d at 103;

59

*Dynex Com., Inc.*, 348 S.W.3d at 900 (citation omitted). Tactical is merely an incidental beneficiary of the Company Agreement, and that incidental benefit is contingent on its affiliation with Gagliano and the other conditions in Section 8.4(d)(v) of the Company Agreement, which Tactical would have been required to meet before benefitting from the sale of L&S products that incorporated control panels like the ones Tactical made. *See Brumitt*, 519 S.W.3d at 103–04; *MCI Telecomms.*, 995 S.W.2d at 651–52.

Looking at the Company Agreement's language and the parties' intent, we conclude that Tactical is merely an incidental beneficiary and as such has no right to enforce the Company Agreement. *See Brumitt*, 519 S.W.3d at 103; *Dynex Com.*, 348 S.W.3d at 900; *Esquivel*, 992 S.W.2d at 543. Thus, we further conclude that Tactical did not have standing to assert a breach of contract claim against Appellants. *See Esquivel*, 992 S.W.2d at 543; *Maddox*, 361 S.W.2d at 756.

Based on our interpretation of the Company Agreement, we conclude the trial court erred by granting Gagliano's Traditional Motion for Partial Summary Judgment and in finding Tactical to be a third-party beneficiary of the Company Agreement. We sustain Appellants' second issue and vacate that portion of the trial court's judgment finding Tactical is a third-party beneficiary of the Company Agreement. Having concluded that the trial court erred, we render the judgment the trial court should have rendered and further conclude as a matter of law that Tactical

60

is not a third-party beneficiary of the Company Agreement. *See Fielding*, 289 S.W.3d at 848.

Since sustaining Appellants' first and second issues affects the jury's verdict regarding the parties' breach of contract claims and resulting damages and attorneys' fees regarding same, we must reverse the portions of the trial court's judgment regarding the parties' breach of contract claims and remand for further proceedings consistent with this opinion. We reverse the following portions of the trial court's judgment: against L&S Pro-Line and to Gagliano for breach of contract in the amount of $2,638,101.05; against Burkett and to Gagliano for breach of contract in the amount of $2,638,101.05; against L&S Pro-Line and to Gagliano for reasonable and necessary legal fees Gagliano incurred in this proceeding through trial and completion of the trial proceedings in the amount of $1,170,000; against Burkett and to Gagliano for reasonable and necessary legal fees Gagliano incurred in this proceeding through trial and completion of the trial proceedings in the amount of $1,170,000; against L&S Pro-Line and to Gagliano for reasonable and necessary court costs and expert witness fees in the amount of $113,190; against L&S Pro-Line and to Gagliano for reasonable and necessary appellate attorney fees; against Burkett and to Gagliano for reasonable and necessary appellate attorney fees.

We reverse the following portions of the trial court's judgment against L&S Pro-Line and Burkett and to Tactical: against L&S Pro-Line and to Tactical for

breach of contract in the amount of $2,389,725.29; and against Burkett and to Tactical for breach of contract in the amount of $2,389,725.29. We render judgment that Tactical take nothing against L&S and Burkett.

## **Issues Three through Six: Legal and Factual Sufficiency**

In issues three, four, five, and six, Appellants complain that there is insufficient evidence to support the jury's conclusion that they breached the Company Agreement, and insufficient evidence to support the jury's award of actual damages, punitive damages, and attorney's fees.

## **Standard of Review**

In a legal sufficiency review, we must consider all the evidence "'in the light most favorable to the party in whose favor the verdict has been rendered,'" and "'every reasonable inference deducible from the evidence is to be indulged in that party's favor[.]'" *Bustamante v. Ponte*, 529 S.W.3d 447, 456 (Tex. 2017) (quoting *Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex. 1997)).

> Evidence is legally insufficient to support a jury finding when: (1) the record discloses a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence establishes the opposite of a vital fact.

*Crosstex N. Tex. Pipeline, L.P. v. Gardiner*, 505 S.W.3d 580, 613 (Tex. 2016) (citations omitted). As the sole judges of the witnesses' credibility and the

62

weight to give their testimony, the jurors may choose to believe one witness and disbelieve another. *City of Keller*, 168 S.W.3d at 819. We "credit favorable evidence if reasonable jurors could, and disregard contrary evidence unless reasonable jurors could not." *Id.* at 827. "The final test for legal sufficiency must always be whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review." *Id.* "We will uphold the jury's finding if more than a scintilla of competent evidence supports it." *Tanner v. Nationwide Mut. Fire Ins. Co.*, 289 S.W.3d 828, 830 (Tex. 2009) (citation omitted); *Herrera v. Wendell Legacy Homes, LLC*, 631 S.W.3d 441, 451 (Tex. App.—Beaumont 2021, no pet.). We presume jurors made all inferences for the verdict, but only if reasonable minds could do so. *Serv. Corp. Int'l v. Guerra*, 348 S.W.3d 221, 228 (Tex. 2011). "Jurors may not simply speculate that a particular inference arises from the evidence." *Id.* (citing *City of Keller*, 168 S.W.3d at 821).

When challenging the factual sufficiency of the evidence supporting an adverse finding on which the appellant did not have the burden of proof at trial, the appellant must demonstrate that insufficient evidence supports the adverse finding. *Croucher v. Croucher*, 660 S.W.2d 55, 58 (Tex. 1983); *Am. Interstate Ins. Co. v. Hinson*, 172 S.W.3d 108, 120 (Tex. App.—Beaumont 2005, pet. denied). When reviewing a factual sufficiency challenge, we consider and weigh all the evidence in support of and contrary to the jury's finding. *Mar. Overseas Corp. v.*

*Ellis*, 971 S.W.2d 402, 406–07 (Tex. 1998). We set aside a finding only if it "is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust." *Dyson v. Olin Corp.*, 692 S.W.2d 456, 457 (Tex. 1985) (citation omitted).

**Evidentiary Sufficiency to Support Breach of Contract**

In issue three, Appellants complain there is insufficient evidence to support the jury's conclusion that they breached the Company Agreement. Having already reversed the portions of the trial court's judgment regarding the parties' breach of contract claims and remanding for further proceedings consistent with this opinion, we need not address this issue. *See* Tex. R. App. P. 47.1.

**Evidentiary Sufficiency to Support Actual and Punitive Damages**

In issue four, Appellants complain that the jury's award of punitive damages was excessive, duplicative, and not supported by factually sufficient evidence. In issue five, Appellants complain that the jury's award of actual damages was not supported by legally and factually sufficient evidence.

Having sustained Appellants' first issue, we reversed the portions of the trial court's judgment regarding the parties' breach of contract claims and resulting damages and attorneys' fees, and remand for the determination of whether Appellants or Gagliano breached the contract. On remand, any breach of contract damages must be considered in light of our determination that Burkett's purported exercise of Section 12.7(b) of the L&S Company Agreement was effective. We have

64

also reversed the jury's award of lost profits based on our determination that Tactical is not a third-party beneficiary of the Company Agreement and rendered judgment that Tactical take nothing against L&S and Burkett. Therefore, we need not address issue five concerning breach of contract damages. *See id*.

Considering our determination that Burkett's exercise of Section 12.7(b) of the L&S Company Agreement was effective, we also reverse the jury's finding of Appellants' breach of fiduciary duty and the jury's award of breach of fiduciary damages. We remand for the determination of whether Appellants or Gagliano breached any fiduciary duty prior to Burkett effectively exercising Section 12.7(b) of the L&S Company Agreement on June 11, 2019.

Accordingly, we reverse the following portions of the trial court's judgment: against Burkett and to Gagliano for breach of fiduciary duty in the amount of $5,553,163.45; and against Burkett and to Gagliano, standing in the shoes of L&S, for breach of fiduciary duty in the amount of $5,553,163.85.

Since we have reversed the actual damages awards, we must also reverse the exemplary damages awards, because the exemplary damages awards must be proportionate to the compensatory damages awards. *Bunton v. Bentley*, 153 S.W.3d 50, 53 (Tex. 2004). Accordingly, we reverse the following portions of the trial court's judgment: against Burkett and to Gagliano as punitive damages for Burkett's malicious, grossly negligent and intentionally self-enriching breach of fiduciary duty

65

in the amount of $5,276,202.10; and against Burkett and to Gagliano, standing in the shoes of L&S as punitive damages for Burkett's malicious, grossly negligent and intentionally self-enriching breach of fiduciary duty in the amount of $11,106,329.70.

**Evidentiary Sufficiency to Support Attorney's Fees**

In issue six, Appellants argued that the jury's award of attorney's fees was not supported by legally and factually sufficient evidence. We have already reversed the portions of the trial court's judgment awarding attorney's fees for the breach of contract damages. Based on our determination that Burkett effectively exercised Section 12.7(b) of the L&S Company Agreement, we also reverse the portion of the trial court's judgment awarding Gagliano attorney's fees for representing against Burkett's failed request for a declaration regarding his purported exercise of Section 12.7(b).

Since Appellants failed to challenge the portions of the trial court's judgment awarding attorney's fees to Snook and to Gagliano for prevailing against L&S's theft claim under the Texas Theft Liability Act, we affirm part of the trial court's judgment, as follows: against L&S and to Gagliano for reasonable and necessary legal fees to defend and prevail against L&S's theft claim under the Texas Theft Liability Act through trial in the amount of $30,000 and the conditional award of appellate attorney's fees; and against L&S and to Snook for reasonable and

necessary attorney's fees incurred through trial in the amount of $39,000 and the conditional award of appellate attorney's fees.

### Issue Seven: Motion to Strike Legal Expert Douglas Moll

In issue seven, Appellants complain the trial court abused its discretion by striking its expert, Douglas Moll. In the trial court, Appellees argued that Moll was being offered to draw conclusions of law that would confuse the jury and prejudice Appellees. Appellants assert that Moll's testimony was admissible because it (1) concerned the question of breach of fiduciary duties, which is a mixed question of law and fact, (2) was based on Moll's qualifications as an expert, and (3) was relevant, because his testimony would have aided the jury in understanding the subject of fiduciary duties in the context of an LLC. Appellants explained that they timely designated Moll as an expert on July 27, 2020, which was before the deadline of August 6, 2020, and nine months before the April 2021 trial. Appellants argue that they should not be punished for Appellees' failure to depose Moll and designate a rebuttal witness in the eight-month period prior to the trial.

Appellees counter that Appellants failed to timely designate Moll as required by the docket control order, failed to present evidence at the *Robinson* hearing to show that he was qualified and reliable, and failed to provide them with an expert report. *See E.I. du Pont Nemours & Co., Inc. v. Robinson*, 923 S.W.2d 549 (Tex. 1995). Appellees maintained that any error in excluding Moll was harmless because

Gagliano prevailed under Burkett's common law fiduciary duty claim, which Appellants did not challenge on appeal, and because under the Company Agreement, Gagliano did not owe L&S a duty of loyalty. Appellants also argued that Moll's offer of proof shows that he intended to testify about pure questions of law concerning the fiduciary duties owed by members and officers of a member-managed LLC and that Burkett did not breach the fiduciary duties that he owed to L&S.

We review a trial court's decision to exclude an expert who has not been properly designated for an abuse of discretion. *See Fort Brown Villas III Condo. Ass'n v. Gillenwater*, 285 S.W.3d 879, 881 (Tex. 2009) (citation omitted). Unless otherwise ordered by a trial court, a party seeking affirmative relief must designate an expert within 90 days before the end of the discovery period. Tex. R. Civ. P. 195.2(a).[3] The record shows that on June 6, 2019, the trial court issued a Scheduling Order, which included a trial setting for the case on the jury docket for March 2, 2020, and required the parties to provide their expert witness designations 90 days before trial. *See id*. 190.4. The record also indicates that on August 18, 2020, which was after Appellants untimely designated Moll, the trial court entered an Order Adopting and Modifying Scheduling Order.

---

[3]When we have cited any Rule of Civil Procedure in the opinion, we have cited to the current version of the Rule. Any changes to the Rules that have occurred since the suit was filed are not relevant since the changes are either not applicable or they do not affect the outcome of the appeal.

A party who fails to timely amend or supplement a discovery response, including a required disclosure, may not introduce in evidence the material or information that was not timely disclosed, including expert witness testimony, unless the trial court finds that (1) there was good cause for the failure to timely provide the information or (2) the failure to provide the discovery will not unfairly surprise or prejudice the other party. *Id*. 193.6(a). The burden of establishing good cause or lack of unfair surprise or unfair prejudice is on the party seeking to call the witness, and a finding of good cause or of the lack of unfair surprise or prejudice must be supported by the record. *Id*. 193.6(b).

On July 22, 2020, Appellants filed their Second Amended Expert Designation, which did not include Moll. On July 27, 2020, in their Third Amended Expert Designations, Appellants designated Moll for the first time; however, they did not provide the Appellees with an expert report. Appellees filed a Motion to Strike Moll's designation and testimony. In the motion, Appellees complained that Moll should be stricken because Appellants failed to timely designate Moll by the Docket Control Order's July 22, 2020, deadline. Appellees explained that Appellants designated Moll as an expert on fiduciary duties on July 27, 2020, after they requested a five-day extension to their third deadline for designating experts, which was on July 22, 2020, and despite the fact that L&S's Original Petition, on file for more than two years, included a breach of fiduciary duty claim. Appellees also

complained that Appellants had refused to timely offer dates for Moll's deposition, and they argued they would be prejudiced by allowing Moll to be designated so late since they had not designated a rebuttal expert.

Appellees also argued that Moll's testimony was irrelevant and should be stricken because the Company Agreement contractually eliminated Gagliano's fiduciary duty to L&S, and the Company Agreement allowed Gagliano to engage in "self-interested" transactions involving Gagliano, Tactical, and L&S. Appellees also argued that Moll's testimony, if allowed, would be conclusory, speculative, unreliable, and would contain impermissible legal conclusions about fiduciary duties that would usurp the trial court's role or involve impermissible opinion testimony on mixed questions of law and fact that relied on unsubstantiated interpretations of Texas law. Appellees maintained that if allowed, Moll's testimony would be highly prejudicial and misleading as to the issues of Burkett's fiduciary duties to L&S in the LLC context because it is an unsettled area of Texas law.

In response to Appellees' Motion to Strike their expert, the Appellants argued that Moll's testimony if allowed would be relevant, credible, and reliable as to the duties of fiduciaries as those duties applied to Gagliano and Burkett. According to Appellants, Moll's testimony was needed because the subject matter in his testimony, which involved the duties of managers of LLCs, was beyond the knowledge of most jurors. According to the Appellants, Moll's testimony would aid

70

the jury's understanding of the subject matter, it would be based on his qualifications and expertise, his testimony would be relevant given the issues in the case, and the testimony would not be unfairly prejudicial. Appellants maintained that the Company Agreement did not fully eliminate Gagliano's duty of loyalty to L&S because it was restricted to the non-compete and non-solicitation provisions. Appellants explained that on July 22, 2020, they requested that the trial court grant a "brief but necessary five-day extension to designate testifying experts on L&S Pro Line's and Burkett's affirmative claims." They noted that while Appellees opposed the request, Appellees failed to show they would suffer any prejudice. Appellants maintained that good cause existed because their original expert was unable to testify at trial.

During a pretrial hearing, the trial court considered Appellees' Motion to Strike Moll. Appellees argued that Moll's designation was late without excuse, and Appellants had years to designate an expert on the duties of a fiduciary. Appellees explained that because Appellants' request to extend the deadline was never granted, they did not designate a rebuttal expert. Appellees maintained that they would be prejudiced if the trial court were to allow Moll's late designation.

Appellees also argued that Moll's testimony about legal issues on fiduciary duties in limited liability companies would invade the Court's province. They also complained the Company Agreement expressly disclaims Gagliano's fiduciary

71

duties, and Moll failed to show he is uniquely qualified to interpret the Company Agreement.

Appellants explained they filed a Motion for Leave to designate five days after the deadline because they had learned their other expert had elected to withdraw. Appellants argued that Appellees were not prejudiced because they had ample time to depose Moll but chose not to, and Appellees failed to show that Moll intended to offer testimony on a question of law. Appellants argued that Moll's opinion about whether there was a breach of fiduciary duties is a mixed question of law and fact.

Appellees responded that Moll's designation was late and did not include a report, and Appellants had the obligation to tender him for a deposition reasonably and promptly, which did not occur. Appellees argued that the hearing was a *Robinson* hearing and there was no evidence in the record satisfying Appellants' burden as to Moll's qualification, relevancy, reliability, methodology, and opinions. Appellees maintained that Appellants' counsel could not even tell the trial court what Moll's opinions were.

After taking the arguments under advisement, the trial court denied Appellants' Motion for Leave to Designate Douglas Moll and granted All Defendants' Motion to Strike and Exclude the Testimony of Plaintiff's and Third-Party Defendant Burkett's Designated Expert Douglas Moll. Appellants filed a Motion to Reconsider, which the trial court heard during a second pretrial hearing.

The trial court stated that it considered whether Appellees would suffer any unfair prejudice under the 193.6 exception to the late designation and that Appellants' counsel informed the court that he did not know what Moll's opinions were.

As to its decision to exclude Moll's testimony, the trial court explained that after Appellants' counsel represented that he did not know what Moll's opinions were,

> [so] then that it weighed more into my, okay, well, is there any unfair prejudice if the sponsoring party doesn't know what the opinions are going to be? I had a - - thought that then definitely the other side would be prejudiced, so then I denied the motion leave and then I excluded him based on that.
> So I'm going to deny the motion to reconsider Douglas Moll as an expert in this . . . matter.

The trial court granted Appellants' request to make an offer of proof about Moll's opinion, but the trial court explained that "the opportunity for those opinions to come out would have been last week when we had the motion to strike."

In the offer of proof, Professor Moll testified he graduated from Harvard Law School and was licensed in Texas and currently working as a business law professor at University of Houston Law Center. Moll testified that Appellants' counsel retained him as an expert, and based on his review of documents, he opined that the business development expenses at issue in the case do not rise to the level of a breach of fiduciary duty on Burkett's part. Moll explained that the business expenses were designed to benefit L&S, Burkett's incentives were aligned, and as a 75% owner,

73

Burkett was positioned to not want to waste money. Moll also explained that no evidence showed that the business development expenses were excessive or that any benchmark had been exceeded. Moll testified that there was no evidence that Burkett's alleged failure to obtain Gagliano's consent for expenses over $5,000 harmed L&S, and harm is necessary for a breach of fiduciary duty claim against L&S. Moll also testified that Gagliano had paid and acquiesced in the business development expenses, and even if he thought the expenses were "unwise, foolish [or] negligent, that is not enough to rise to the level of a breach of fiduciary duty." Moll also explained that it was not illegal for Burkett to hire Kyle Smith, who had a criminal record, and there was no harm to L&S.

As for Gagliano, Moll testified that the evidence suggested Gagliano abdicated his CFO responsibilities, which in his opinion, constituted a breach of fiduciary duty. Moll testified that if the evidence showed Gagliano used company expenditures for personal purposes, that would be a breach of fiduciary duty. After Moll testified about his opinions, the trial court reviewed the timing of Appellants' designations, stated it was not going to treat the offer of proof as a rehash of the *Robinson* hearing, and then denied Appellants' Motion to Reconsider its Order striking Moll.

Based on this record, the trial court could have reasonably concluded that Appellants failed to timely designate Moll as an expert and disclose Moll's opinions

74

as required in the trial court's scheduling order as to expert witness designations. It was within the trial court's discretion to deny Appellants the opportunity to call an expert witness who was not properly designated by the relevant deadline. *See Perez v. Embree Const. Grp., Inc.*, 228 S.W.3d 875, 884 (Tex. App.—Austin 2007, pet. denied). We conclude that the trial court did not abuse its discretion by denying Appellants' motion for leave to designate Moll as an expert and by excluding Moll's testimony because Moll was not properly designated because of Appellants' failure to comply with the scheduling order. *See Gillenwater*, 285 S.W.3d 882; *May v. Ticor Title Ins.*, 422 S.W.3d 93, 105 (Tex. App.—Houston [14th Dist.] 2014, no pet.); *Perez*, 228 S.W.3d at 884. We further conclude that Appellants failed to satisfy their burden of establishing good cause or a lack of unfair surprise or prejudice against Appellees as the record shows the trial court found that Appellees would suffer unfair prejudice because Appellants were unable to disclose Moll's opinions during the *Robinson* hearing. *See* Tex. R. Civ. P. 193.6(b). We overrule issue seven.

## Issue Eight: Gagliano's Expert Testimony

In issue eight, Appellants complain the trial court abused its discretion by allowing Gagliano to testify as an expert on Tactical's lost profits and by allowing testimony of lost revenue rather than lost profits. Yet since we sustained Appellants' second issue and concluded as a matter of law that Tactical is not a third-party beneficiary, we reversed the portions of the trial court's judgment awarding Tactical

75

damages against L&S and Burkett. Thus, we need not address this issue. *See* Tex. R. App. P. 47.1.

**Issue Nine: Sanctions Award and Motion for Mistrial**

In issue nine, Appellants argue the trial court erred by denying the Motion for Mistrial. On appeal, they argue the trial court admonished and threatened to arrest Burkett in front of the jury, and the trial court abused its discretion by sanctioning Burkett's counsel, W. Earl Touchstone, $5,000, for violating the trial court's rulings on the Appellees' motion in limine. Appellants argue the trial court's emotional display demonstrated partiality and unfairly prejudiced Burkett, which is reflected in the jury's excessive verdict. Appellants also complain the sanction of $5,000 based on what occurred was unwarranted and excessive, claiming that Touchstone had inadvertently displayed one page of an exhibit that had not been admitted into evidence to the jury. Appellants argue that Touchstone's violation of the Motion in Limine was an innocent mistake and that this Court should reverse the trial court's sanction award because there is no relationship between the amount of the sanction and the purported harm.

"We review a trial court's imposition of sanctions for an abuse of discretion." *Am. Flood Rsch., Inc. v. Jones*, 192 S.W.3d 581, 583 (Tex. 2006) (citation omitted). The test for abuse of discretion is whether the trial court acted without reference to any guiding rules or principles or whether, under the circumstances, the trial court's

76

action was arbitrary or unreasonable. *Low v. Henry*, 221 S.W.3d 609, 614 (Tex. 2007). To determine whether sanctions are appropriate, "the appellate court must ensure there is a direct nexus between the improper conduct and the sanction imposed." *Id.* (citation omitted). We must also ensure the sanction imposed is not excessive and that less severe sanctions would have been enough to promote compliance. *TransAmerican Nat. Gas Corp. v. Powell*, 811 S.W.2d 913, 917 (Tex. 1991).

The party that moves for a mistrial must show a judicial impropriety and that the impropriety caused probable prejudice. *Metzger v. Sebek*, 892 S.W.2d 20, 39 (Tex. App.—Houston [1st Dist.] 1994, writ denied). We review a trial court's denial of a motion for mistrial under an abuse of discretion standard. *See Dolgencorp of Tex., Inc. v. Lerma*, 288 S.W.3d 922, 926 (Tex. 2009). A mistrial is required only in extreme circumstances, where the prejudice is incurable. *See Givens v. Anderson Columbia Co., Inc.*, 608 S.W.3d 65, 71 (Tex. App.—San Antonio 2020, pet. denied) (citation omitted); *In re Estate of Stack*, No. 09-17-00089-CV, 2018 WL 4138939, at \*16 (Tex. App.—Beaumont Aug. 30, 2018, no pet.) (mem. op.). A trial court has discretion over the conduct of a trial and may intervene to maintain control in the courtroom. *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 240–41 (Tex. 2001). A party moving for mistrial must rebut the presumption that a limiting instruction cured any prejudice. *See In re Rudolph Auto., LLC*, 674 S.W.3d 289, 312 (Tex. 2023); *In re*

77

*Commitment of Rivera*, No. 04-22-00324-CV, 2023 WL 7005848, at \*5 (Tex. App—San Antonio Oct. 25, 2023, no pet.) (op. on reh'g).

Touchstone filed an Opposed Motion for Reconsideration of the Court's Sanction's Order, which includes his Affidavit. In the Affidavit, Touchstone claimed that when he was examining Tim Word, he inadvertently displayed page eight of a credit card statement from American Express because Appellees had previously used the statement during a deposition and because the trial court had admitted similar exhibits that contained credit card statements during the trial. Touchstone stated that he mistakenly thought the trial court had admitted the American Express Statement, which was marked as Exhibit 13, and that Appellees had redacted any objectional portion of the statement. Touchstone explained that he accidentally displayed the portion of the exhibit thinking it had been admitted when it had not, but his error was inadvertent and unintentional, as he had a good faith belief that the trial court had admitted Exhibit 13. Upon realizing that Exhibit 13 had not been admitted, Touchstone swore that he removed page eight from the exhibit the jury could view, which did not contain any specifically excluded charges pertaining to strip clubs.

Appellees filed a Response to Touchstone's Opposed Motion for Reconsideration of the Court's Sanction's Order, arguing that the trial court's sanction was an appropriate response to bring Touchstone into compliance with the trial court's orders. They also argued that Touchstone waived his right to have the

78

trial court reconsider the sanction because he did not ask the court to reconsider its ruling until after the trial court rendered judgment. Appellees' Response included the Affidavit of one of its attorneys, who claimed that when Touchstone's assistant published Exhibit 13, she saw three credit card entries reflecting Enterprise as a payee and the phone number for the St. James Cabaret, a Houston strip club. Appellants filed a Reply to Appellees' Response, denying that they had waived their right to ask the trial court to reconsider its ruling, and Appellants maintained that Touchstone acted under the mistaken belief that the exhibit had been admitted without a calculated intent to introduce evidence that the trial court had excluded under its pretrial rulings. Appellants' Reply included the Declaration of Touchstone's paralegal, who published Exhibit 13 to the jury during trial. In her Declaration, she asserted that she did not scroll through the credit card statement in a manner in which pages other than page eight would have been published to the jury before she located and published page eight.

An order on a motion in limine is an action taken by the court in the exercise of its control over its proceedings, and the parties have a duty to comply with that order. *Onstad v. Wright*, 54 S.W.3d 799, 805 (Tex. App.—Texarkana 2001, pet. denied). "Noncompliance with the order may lead to contempt or other sanctions the trial court deems appropriate." *Id.* (citations omitted). During a pretrial hearing, the trial court considered L&S's Motions in Limine, which included the requests to

79

exclude Burkett's use of L&S's funds at a gentlemen's club and for prostitution, and the trial court granted L&S's Motion in Limine as to those points. The record shows that Appellees filed their First Amended Trial Exhibit List, which included trial Exhibit 13, and L&S's American Express Business Credit Card Statement, which shows that on page eight a $888.38 PayPal payment to "TTWORD." The record shows that TTWORD is and initialism for Tim Word of Enterprise. Appellants filed their Initial Objections to Appellees' Trial Exhibits, including Exhibit 13.

The record shows that Touchstone violated the trial court's rulings on the Appellees' Motion in Limine several times before the trial court sanctioned him, and when those violations occurred, the trial court instructed Touchstone to follow the Court's orders. On the second of these violations, the trial court stated "[t]hat was a jab that I don't stand for. Stick to the facts. Stick to the legal Texas Rules of Evidence that's permitted in front of a jury, and if you want to get into something, approach. I know you did not ask that."

At one point, the trial court instructed Touchstone to take down his exhibit, asked the attorneys to approach the bench, informed Touchstone that he was shutting him down on Gagliano and that it "read up there very clearly what was supposed to be out." Gagliano's counsel stated that Touchstone "displayed to the jury, in legible form, the treasurer's information associated with the strip club[,]" and the trial court agreed, stating: "That's exactly true." The trial court noted the white noise was on

when the attorneys approached, and it explained that it could not have been clearer on its rulings multiple times that evidence that the Court had ordered redacted should not be displayed to the jurors. Touchstone answered that he thought Defense Exhibit 163 had been pre-admitted, and he did not create the redactions. Gagliano's counsel responded that it was an excluded exhibit. The trial court stated that Defense Exhibit 163 was not pre-admitted, instructed the parties to ensure they complied with the court-ordered redactions of exhibits, and informed the parties that it would impose a sanction of $5,000 for every incorrect redaction. The trial court also stated that "it's incumbent on you, both of y'all, to make sure those are right, because if those go back there and there's little sneak attacks like that, then it's not going to be good."

Later, after the trial court sustained Appellees' objection to Touchstone's question about another matter that violated the trial court rulings on the Motion in Limine, Touchstone published Defense Exhibit 13, which had not been admitted. When that happened, the trial court sanctioned Touchstone $5,000 for violating the trial court's order. Exhibit 13 shows the charge to TTWORD. The trial court told Touchstone, who claimed it was unintentional, that he received a copy of the court's exhibit list and was responsible for what he published. After the trial court's warning, Touchstone violated the order in limine two more times, and on the second occurrence the trial court sanctioned him $5,000.

The first matter we consider is the relationship between the conduct in question and the sanction imposed. There should be a direct nexus between the offensive conduct, the offender, and the sanction award. *See Low*, 221 S.W.3d at 614. In this case, the trial court addressed Touchstone's multiple violations of the order in limine, which it characterized as "little sneak attacks," and warned that future violations would be sanctioned. Therefore, we conclude this prong is satisfied. *See TransAmerican*, 811 S.W.2d at 917.

Next, we consider whether the punishment is proportional relative to the misconduct and whether the sanction is excessive. *See id.* Here, the trial court warned Touchstone that future violations would result in a $5,000 sanction. The trial court's characterization of Touchstone's violations shows that it viewed the successive violations as evidence of Touchstone's bad faith. *See Cantu v. Guerra & Moore, Ltd. LLP*, 328 S.W.3d 1, 10 (Tex. App.—San Antonio 2009, no pet.) (affirming $10,000 for repeated limine violations appearing in bad faith); *see also Brewer v. Lennox Hearth Prods., LLC*, 601 S.W.3d 704, 716 (Tex. 2020) (stating that direct evidence of bad faith is not required). We conclude that the punishment is proportional relative to the repeated misconduct, the sanction is not excessive, and less severe sanctions would have been insufficient to promote compliance. *See TransAmerican*, 811 S.W.2d at 917. The trial court's $5,000 sanction is not unreasonable or arbitrary, and we cannot say the trial court acted without reference

82

to any guiding rules and principles. *See Low*, 221 S.W.3d at 614. On this record, we conclude the trial court did not abuse its discretion by imposing the sanction award. *See id.*; *Am. Flood Resch., Inc.*, 192 S.W.3d at 583.

As for the Motion for Mistrial, the record shows that during trial, the trial court paused the proceedings, asked to see the attorneys at the bench, and turned on white noise while warning Burkett's counsel that if Burkett were to continue to stare down the trial court, Burkett would be kicked out of the courtroom. The trial court summoned Burkett to the bench and warned him that "[i]f I catch you staring me down one more time, I'm going to have you arrested." The trial court instructed Burkett to sit down and "[d]on't look up here again." The judge told Touchstone that Burkett had been staring him down the whole trial and that Burkett would not be allowed to intimidate the Court. After the bench discussion concluded, the judge turned off the white noise and stated, "We will not be bullied in this courtroom. Is that clear by everybody in – in this courtroom?"

At another point, the trial court asked the attorneys to approach the bench, turned the white noise on, and stated that it wanted to put some aspects of Burkett's behavior on the record. The trial court stated that it had asked the lawyers and bailiffs to keep an eye on Burkett, who had spread his legs open toward the trial court and stared down the court and opposing counsel with intimidating looks. The trial court also stated that Burkett approached the trial court's bench and then looked and

inquired about personal items and guns. The trial court asked the parties to "hold back some of those extra responses" and stated it was concerned about the court perceiving a threatening type of behavior over several days.

Touchstone moved for a mistrial based on the trial court's statements that Burkett was staring the court down. When Touchstone claimed the comments were made in open court in front of the jury, the trial court stated that "[w]e were approached outside of their presence[]" when he made the comments and that "[w]hat was made in front of the jury was, 'We will not – this – we will not bully anyone in this court,' and that was addressed to every single person in this courtroom." The trial court denied the motion for mistrial.

The next day, Appellants renewed their motion for mistrial in the trial court's chamber, and the trial court denied the motion. The trial court agreed to instruct the jury to disregard admonitions to the parties and anything said during private conversation at the bench with the white noise on. The trial court reiterated that the comments made in the jury's presence were to all parties for the safety of the court and everyone involved, and no one was singled out. The trial court instructed the jury as follows:

> Any private conversations that occur at the bench with the white noise on or if – if, by chance, y'all ever heard anything, comments during those private conversations are not to be considered as evidence or play any role in your deliberations nor should they ever. You should base your decision solely on the evidence that is presented in open

court, the documents, the testimony, and weigh your deliberations based on those types of things.

In addition, anytime the Court admonishes – makes a ruling or admonishes the lawyers or parties in the case, that, again, is not evidence for you to consider. That is – should play no role in your deliberation process.

Based on this record, we hold that the trial court's admonishment to "everybody" was well within its ministerial discretion to maintain order in the courtroom and did not display bias. *See Francis*, 46 S.W.3d at 240–41. The trial court's remarks during the bench conference also do not support bias, and the record shows that the trial court's remarks were made at the bench with the white noise on. *See Haynes v. Union R.R. Co.*, 598 S.W.3d 335, 354, 356 (Tex. App.—Houston [1st Dist.] 2020, pet. dism'd) (stating that judicial remarks during trial that are critical, disapproving, or even hostile do not ordinarily support a bias or partiality challenge); *Metzger*, 892 S.W.2d at 40 (explaining where jury did not decide case, prejudice against a party's attorney's is irrelevant).

The trial court also instructed the jury that when deliberating on its verdict not to consider any private conversations at the bench with the white noise or any admonishments that the court made to the lawyers or parties. We presume the jury followed the trial court's instruction. *See In re Rudolph Auto., LLC*, 674 S.W.3d at 312; *In re Commitment of Rivera*, 2023 WL 7005848, at *5. Nothing in the record shows that the remarks or admonishments had any harmful effect, the jury could not

85

follow the trial court's instruction, or that the presumption was rebutted by showing that the probability that the remarks or admonishments caused harm is greater than the probability the jury decided the case on proper proceedings and evidence. *See In re Commitment of Allen*, No. 09-11-00449-CV, 2012 WL 3860466, at *3 (Tex. App.—Beaumont Sept. 6, 2012, no pet.) (mem. op.); *Quiroz ex rel. Quiroz v. Covenant Health Sys.*, 234 S.W.3d 74, 90 (Tex. App.—El Paso 2007, pet. denied). We conclude Appellants failed to establish the trial court abused its discretion in denying the Appellants' motion for mistrial and failed to show that any prejudice caused by the errors the Appellees allege occurred were incurable. *See Lerma*, 288 S.W.3d at 926; *Givens*, 608 S.W.3d at 71. We overrule issue nine.

## CONCLUSION

We sustain Appellants' first issue, vacate that portion of the trial court's judgment granting Gagliano's Motion for Partial Summary Judgment and holding that Burkett's purported exercise of Section 12.7(b) of the L&S Company Agreement was ineffective, and render judgment that Burkett's exercise of Section 12.7(b) of the L&S Company Agreement was effective on June 11, 2019. We sustain Appellants' second issue, vacate that portion of the trial court's judgment granting Gagliano's Motion for Partial Summary Judgment holding that Tactical is a third-party beneficiary of the Company Agreement, and render judgment that Tactical is not a third-party beneficiary of the Company Agreement.

86

Since sustaining Appellants' first and second issues affects the jury's verdict regarding the parties' breach of contract claims and resulting damages and attorneys' fees regarding same, we must reverse the portions of the trial court's judgment regarding the parties' breach of contract claims. We reverse the following portions of the trial court's judgment against L&S and Burkett and to Gagliano and remand for further proceedings consistent with this opinion: against L&S and to Gagliano for breach of contract in the amount of $2,638,101.05; against Burkett and to Gagliano for breach of contract in the amount of $2,638,101.05; against L&S and to Gagliano for reasonable and necessary legal fees Gagliano incurred in this proceeding through trial and completion of the trial proceedings in the amount of $1,170,000; against Burkett and to Gagliano for reasonable and necessary legal fees Gagliano incurred in this proceeding through trial and completion of the trial proceedings in the amount of $1,170,000; against L&S and to Gagliano for reasonable and necessary court costs and expert witness fees in the amount of $113,190; against L&S and to Gagliano for reasonable and necessary appellate attorney fees; against Burkett and to Gagliano for reasonable and necessary appellate attorney fees.

We reverse the following portions of the trial court's judgment against L&S and Burkett and to Tactical: against L&S and to Tactical for breach of contract in the amount of $2,389,725.29; and against Burkett and to Tactical for breach of

contract in the amount of $2,389,725.29. We render judgment that Tactical take nothing against L&S and Burkett.

Having reversed the parties' breach of contract claims and resulting damages and attorneys' fees regarding same, we must also reverse the portions of the trial court's judgment regarding the parties' breach of fiduciary duty claims, and we remand for the jury to determine whether Appellants breached any fiduciary duty prior to Burkett effectively exercising Section 12.7(b) of the L&S Company Agreement on June 11, 2019. Accordingly, we reverse the following portions of the trial court's judgment against L&S and Burkett and to Gagliano: against Burkett and to Gagliano for breach of fiduciary duty in the amount of $5,553,163.45; and against Burkett and to Gagliano, standing in the shoes of L&S, for breach of fiduciary duty in the amount of $5,553,163.85.

Having reversed the portions of the trial court's judgment regarding the parties' breach of contract and breach of fiduciary duties claims, we reverse the following portions of the trial court's judgment regarding punitive damages: against Burkett and to Gagliano as punitive damages for Burkett's malicious, grossly negligent and intentionally self-enriching breach of fiduciary duty in the amount of $5,276,202.10; and against Burkett and to Gagliano, standing in the shoes of L&S as punitive damages for Burkett's malicious, grossly negligent and intentionally self-enriching breach of fiduciary duty in the amount of $11,106,329.70.

Since Appellants failed to challenge certain portions of the trial court's judgment, we affirm the following portions: L&S Pro-Line voluntarily non-suited its Texas Theft Liability Act claim to avoid an unfavorable ruling on the merits; as such Gagliano is the prevailing party under the Texas Theft Liability Act; Gagliano, Snook Holdings, and Tactical Automation are not entitled to recovery of attorney fees specifically under Chapter 38 of the Texas Civil Practice and Remedies Code because L&S Pro-Line is a limited liability company; judgment against L&S and to Snook for breach of contract in the amount of $109,239.12; judgment against L&S and to Gagliano for additional and reasonable and necessary legal fees to defend and prevail against L&S's theft claim under the Texas Theft Liability Act through trial in the amount of $30,000 and conditional attorney's fees to defend on appeal; and judgment against L&S and to Snook for reasonable and necessary attorney's fees incurred through trial in the amount of $39,000 and conditional attorney's fees to defend on appeal. We also affirm the trial court's sanction award.

Based on our disposition of the trial court's pretrial rulings and the jury's findings, we also reverse the trial court's findings or orders that: Burkett's purported exercise of Section 12.7(b) of the L&S Pro-Line Company Agreement was ineffective; Burkett did not effectively purchase any of Gagliano's interest in L&S Pro-Line on June 11, 2019, under Section 12.7(b) of the L&S Pro-Line Company Agreement; L&S Pro-Line **TAKES NOTHING** as to any of its affirmative claims;

89

Burkett **TAKES NOTHING** as to any of his affirmative claims; L&S did not issue to Gagliano all distributions under Section 6.3 of the Company Agreement; Tactical Automation is a third-party beneficiary of the L&S Pro-Line Company Agreement; L&S Pro-Line's Officer Removal claim is dismissed; Gagliano should not be removed as a manager, CFO and Treasurer of L&S under the Company Agreement and he is allowed to participate in any vote authorized by the Company Agreement or Texas law on such issues; L&S is a closely held limited liability company and Gagliano and Burkett are its only Members; as such, Gagliano has standing and it is equitable for him to bring a direct and derivative suit against Burkett for the benefit of L&S and for the benefit of Gagliano himself as a Member of L&S; Gagliano was named as a defendant in this lawsuit precisely because he is a Member, Manager, and officer of L&S and he prevailed on each and all matters asserted against him; as such, Gagliano is entitled under Section 14.1 of the L&S Company Agreement to indemnification from L&S for all his costs, expenses, and attorney fees incurred in connection with the lawsuit; Burkett committed a Terminating Event under the Company Agreement because of his (i) neglect of his duties to the L&S Company Agreement as a result of his, (ii) fraud and dishonesty in connection with his fiduciary duties to L&S, and (iii) breach of section 9.6 of the Company Agreement; Burkett is required to sell his ownership interest in L&S under Sections 8.6 and 9.5 and Exhibits B and D of the Company Agreement because Burkett committed a

90

Terminating Event under the L&S Company Agreement; Burkett is **ORDERED** to transfer his ownership interest in L&S to Gagliano, the remaining member of L&S, pursuant to and in conformity with Sections 8.6 and 9.5 and Exhibits B and D of the L&S Company Agreement; it is equitable and just for Gagliano to be awarded against Burkett and L&S reasonable legal fees Gagliano incurred to pursue and defend against various declaratory judgment claims made in this proceeding; and it is equitable and just for Gagliano to be conditionally awarded against Burkett and L&S appellate attorney fees. We also reverse the trial court's Order entering an injunction against L&S and Burkett.

For the reasons explained above, we affirm the trial court's judgment in part, reverse and render the trial court's judgment in part, and reverse and remand the cause in part to the trial court for further proceedings consistent with this opinion.

AFFIRMED IN PART; REVERSED AND RENDERED IN PART; REVERSED AND REMANDED IN PART.

W. SCOTT GOLEMON
Chief Justice

Submitted on April 20, 2023
Opinion Delivered June 28, 2024

Before Golemon, C.J., Horton and Wright, JJ.

91